# McLendon v. The State.

### Violating Revenue Law.

(Decided June 20, 1912. Rehearing denied December 17, 1912. 60 South. 392.)

1. *Constitutional Law; License; Exemption.*—Section 33½, Acts 1911, page 181, is not violative of the bill of rights because it contains the proviso exempting ex-Confederate soldiers from the operation thereof.

2. *Same.*—Section 33½, Acts 1911, page 181, is violative of the equality clause of the 14th amendment of the Federal Constitution and invalid, wherein it exempts ex-Confederate soldiers from the operation thereof.

(Mayfield, J., dissents as to first proposition. Dowdell, C. J., and McClellan and Sayre, JJ., dissent as to the second proposition.)

APPEAL from Montgomery City Court.

Heard before Hon. ARMSTEAD BROWN.

C. L. McLendon was convicted of violating the revenue law imposing license tax upon those engaged in the practice of law and he appealed to the Court of appeals, who certifies the constitutional question involved, to this court.

ARRINGTON & HOUGHTON, for appellant. The section herein referred to unjustly discriminates in favor of ex-Confederate soldiers and against other persons, and by reason thereof violates the federal and state consti-

·[McLendon v. The State.]

tutions, especially the Fourteenth Amendment of the United States Constitution.—Sections 1, 6, 29, 35, 211 and 217, Constitution 1901; *Smith v. Wolff,* 160 Ala. 650; *Montgomery v. Kelly,* 142 Ala. 555; *Phoenix C. Co. v. The State,* 118 Ala. 153; 75 S. C. 62; 165 U. S. 150; 96 Tenn. 696; Cooley's Const. Lim. 482; 33 W. Va. 179. The fact that the occupation involved in those cases was that of peddling, should not prevent the cases being of controlling influence in this case.—63 L. R. A. 179; 56 L. R. A. 570; 99 S. W. 513; 54 Atl. 1081; 82 N. W. 959. The fact that a part of the clause exempting ex-confederate soldiers could be stricken out does not help the cause of the state.—*Vines v. The State,* 67 Ala. 72; *Ex parte Pollard,* 40 Ala. 77. This would be legislation, not construction.—*Yerby v. Cochran,* 101 Ala. 541.

ROBERT C. BRICKELL, Attorney General, and W. L. MARTIN, Assistant Attorney General, and EDWARD S. WATTS, for the State. It was clearly within the police power to promote patriotism, and to make conspicuous and honorable any exhibition of courage, constancy and devotion to the welfare of the state.—56 L. R. A. 570. The statute here is not within the Fourteenth Amendment.—28 L. Ed. 923; 129 U. S. 26; 49 L. Ed. 945; 53 L. Ed. 739; 54 L. Ed. 678; 10 L. R. A. 137; 52 L. Ed. 1. In any event the exception can be stricken, and the statute remain intact as to those not within the exception.—*Fourment v. The State,* 155 Ala. 109; *Montgomery v. Johnson,* 138 Ala. 263; *Harper v. The State,* 99 Ala. 28; *Ex parte Cowart,* 92 Ala. 94; *Powell v. The State,* 69 Ala. 10.

SOMERVILLE, J.—The Court of Appeals certifies to this court for determination the following question:

Is section 33½ of the present Revenue Law (Laws 1911, p. 181), which section reads as follows: "Any person engaged in the practice of law, medicine, osteopathy, dentistry and veterinary surgery and any optician, architect, actuary, public accountant, civil engineer, mechanical engineer, or electrical engineer, having a place of business and charging for his services, shall pay an annual license for the state only of five dollars; provided ex-Confederate soldiers who are entitled to practice any of these professions in Alabama shall not be required to pay this tax. Provided further, that no person shall be required to pay this tax until after he has practiced his profession for one year"— violative of the Constitution of the State of Alabama, and violative of the Constitution of the United Staes?

1. We have considered the quoted section in connection with the following provisions of the Constitution of 1901, viz.:

Section 1. "All men are equally free and independent," and among their inalienable rights "are life, liberty and the pursuit of happiness."

Section 6. No accused person shall "be deprived of life, liberty or property, except by due process of law."

Section 22. No law "making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the Legislature."

Section 29. "No title of nobility or hereditary distinction, privilege, honor, or emolument shall ever be granted or conferred in this state."

Section 35. "The sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression."

Section 211. "All taxes levied on property shall be assessed in exact proportion to the value of such property."

Section 217. "The property of private corporations, associations and individuals of this state shall be forever taxed at the same rate."

As said by one of our great Chief Justices: "When the judicial department is invited to declare the legislative has invaded the Constitution it was under obligation to preserve, though it cannot shrink from the inquiry, it will approach it with caution, examine the question in every possible aspect standing as an impartial arbiter between the co-ordinate departments of the government, subject to the obligation from which its duty arises, and the party complaining of wrong, bound to accord to the legislative department the presumption that it has not transcended its powers, will not, unless it is clear that the enactment and the Constitution cannot co-exist, pronounce a sentence of nullity." Per Brickell, C. J., in *Mayor of Mobile v. Stonewall Ins. Co.*, 53 Ala. 575.

We are aware that in *Montgomery v. Kelly*, 142 Ala. 552, 38 South. 67, 70 L. R. A. 209, it was in effect held that unreasonable discriminations in the imposition of privilege or occupation taxes might invade some of the general constitutional limitations above quoted, although not forbidden by sections 211 and 217. And this principle seems to have found express recognition in earlier cases, also.—*Phoenix Carpet Co. v. State*, 118 Ala. 151, 152, 22 South. 627, 72 Am. St. Rep. 143; *Phoenix Ass. Co. v. Fire Department*, 117 Ala. 631, 653, 23 South. 843, 42 L. R. A. 468; *W. U. Tel. Co. v. State Board*, 80 Ala. 273, 280, 60 Am. Rep. 99. In the last cited case it was said: "Whilst there is no provision of the Constitution, commanding in terms equality and

uniformity, the principle should underlie and regulate the provisions of every law imposing public burdens and charges. * * * The requirement is complied with, when the tax is levied equally and uniformly on all subjects of the same class and kind." And again in *Phoenix Carpet Co. v. State, supra,* it was said: "We may concede that when a tax is imposed on avocations, or privileges, or on the franchises of corporations, it must be equal and uniform. The equality and uniformity consists in the imposition of the like tax upon all who engage in the avocation, or who may exercise the privilege taxed."

Nevertheless, while recognizing this general limitation on the Legislature with respect to these forms of taxation, we are unable to clearly see that the exemption of Confederate veterans from the payment of this occupation tax, as here provided for, is inconsistent with that principle, or in violation of any of the general provisions of the Bill of Rights. Section 2 of the Bill of Rights in the Constitution of 1875 provided: "That all persons resident in this state, born in the United States, or naturalized, or who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the state of Alabama, possessing equal civil and political rights." It is noteworthy that this section was dropped from the Constittuion of 1901; for such a declaration might well be regarded as forbidding any valuable immunity to Confederate veterans of the Civil War which is denied to veterans of that war in general, even conceding that veterans in general (that is, both Confederate and Union) might be thus marked for favor.

In the conclusion above stated all the Justices concur, except MAYFIELD, J., who dissents in a separate opinion.

2. As regards the fourteenth amendment to the Federal Constitution, DOWDELL, C. J., and MCCLELLAN and SAYRE, JJ., are of the opinion that it is not offended by section 33½ of the Revenue Act. ANDERSON, MAYFIELD, and SOMERVILLE, JJ., are of the opinion that the immunity granted to Confederate veterans by its proviso clause is offensive to that amendment, and that the entire section is thereby rendered invalid. SIMPSON, J., is of the opinion that the proviso clause is invalid, but that the rest of the section is valid with the proviso stricken out. That such an exemption as the one here under consideration is invalid, as being in violation of the fourteenth amendment, has been expressly held in at least three states: *State v. Shedroi,* 75 Vt. 277, 54 Atl. 1081, 63 L. R. A. 179, 98 Am. St. Rep. 825; *City of Laurens v. Anderson,* 75 S. C.62, 55 S. E. 136, 117 Am. St. Rep. 885, 9 Ann. Cas. 1003; *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468. And in two other states similar exemptions of veterans have been held to be violative of the uniformity requirements of state Constitutions by reasoning equally applicable to the fourteenth amendment.—*State v. Garbroski,* 111 Iowa, 496, 82 N. W. 959, 56 L. R. A. 570, 82 Am. St. Rep. 524; *Ex parte Jones,* 38 Tex. Cr. R. 482, 43 S. W. 513. The reasoning of these cases is, it seems to the writer, unanswerable. The question does not concern the police power of a state. It is purely and simply a question of taxation for revenue. The separation of those who pursue the vocations taxed into two classes, one consisting of those not Confederate veterans, and the other of those who are, bears no sort of relation to any public policy with respect to those vocations, or to the duties of the two classes as taxpayers. There is no natural distinction between such veterans and other citizens which can legitimately mark them for favor in the unrestricted and unburdened pursuit of occupations which

all citizens have an equal right to follow under equally favorable conditions.

As said by the Supreme Court of Vermont in *State v. Shedroi, supra*: "Assuming that thus to have served as a soldier and to have received an honorable discharge may well merit reasonable considerations at the hands of the state in recognition of patriotism and valor in defense of a common country, yet such considerations cannot exceed those constitutional limits established for the welfare and protection of the whole, for equal protection of the laws requires 'that all persons subjected to such legislation shall be treated alike under circumstances and conditions, both in the privileges conferred and liabilities imposed.'—*Magoun v. Illinois, etc., Bank,* 170 U. S. 283, 18 Sup. Ct. 594 [42 L. Ed. 1037]." More specifically, it seems evident to my mind that the distinction necessarily implied by this exemption between Confederate veterans and Union veterans of the Civil War, to say nothing of veterans of other wars, is invidious, and peculiarly opposed to the spirit and letter of the fourteenth amendment. If a Confederate veteran and a Union veteran should be found pursuing side by side, without license, any one of the taxed vacations, and both should be prosecuted for not having a paid license from the state, I do not see how a court of this state could acquit the one upon proof that he is a Confederate veteran, and at the same time convict the other because he is only a Union veteran, without a palpable violation of the provision that guarantees to all the equal protection of the laws. It may be conceded that the unequal operation of this revenue law is concretely unimportant, and, sentimentally, most agreeable. But it none the less violates a principle, and great organic principles cannot

[McLendon v. The State.]

be suspended in particular cases except at the peril of their ultimate destruction.

3. To hold that the proviso creating the exemption in favor of ex-Confederate soldiers could be stricken out, and the license tax enforced against all persons pursuing the vocations specified, would be in effect to make a statute materially different from that enacted by the Legislature; for this act, by its very terms, imposes the tax on the express condition that it shall not operate on the exempted class. To thus enlarge its field of operation, in spite of the legislative will to the contrary, would manifestly exceed the limits of authorized judicial action, and invade the prerogatives of the Legislature. The case of *Vines v. State,* 67 Ala. 73, is very clearly decisive of this specific question. All concur in this conclusion, except SIMPSON, J., who dissents. Let this answer and opinion be certified to the Court of Appeals.

MAYFIELD, J.—(dissenting.)—I regret that I can not concur in the conclusion upholding the statute in question. Two things make this action of mine in dissenting painful. One, the necessity of disagreeing with the majority of my Brothers; the other, that my views of the law deprive the Confederate veterans of a privilege or immunity which the Legislature has attempted to bestow upon them. I yield to no one in respect for the opinion of my Brothers, nor in veneration or love for the Confederate soldier. If this were a question of policy or philanthropy, I could gladly concur in the conclusion of my Brothers in upholding this statute, which attempts to exempt the Confederate soldier from a privilege tax, and to so exempt him for no other reason than that he is a Confederate soldier. But the question is not one of state policy, nor one of general or

local philanthropy. It is a question purely of consti-
tutional limitation and legislative competency. That
question, simplified and reduced to its last analysis, is
this: Can the Legislature classify the citizenship of
this state into two classes—one, Confederate soldiers,
the other, not—and impose a privilege tax upon the one
class, and exempt therefrom the other? I say they have
no right or power to make such a classification. I take
it that no one would contend that the Legislature could
require the Confederate soldier to pay this tax, and by
the same statute exempt all others therefrom. That
would be bad policy and bad philanthropy; but the pow-
er of the Legislature to tax or exempt them as a class
is the same. There can be no difference as to legislative
power or competency to tax them as a class. The real
question, therefore, is the power of the Legislature to
classify the citizens of the state into these two classes,
for the purpose of taxation—one, Confederate soldiers,
and the other, not—and to tax the one class and
exempt the other.

I assert without fear of contradiction that the deci-
sion of a court of last resort in this case is the only
one to be found which has sustained the power of a
state Legislature to make such a classification and such
a discrimination between the citizens of the state. It
is to be regretted that this grave constitutional inquiry
is so interwoven with a local question of policy, propri-
ety, and philanthropy—a question which always fills
and stirs the hearts and emotions of our people, and
fills their minds with such intensity of feeling as to
make it difficult to consider any other proposition, ac-
cidentally connected with it, in reference to its abstract
merit, or to think that any right, privilege, or immunity
conferred upon the Confederate soldier as a class or
as an individual is either unrighteous or unconstitu-

tional. Unlike that of the United States, the government of the state of Alabama is not one of enumerated powers; yet we must admit that it is a government of limited authority and power. The state and federal Constitutions contain limits upon the power of this state government as a whole, and upon that of each of its three departments. Some of these limitations are expressed ones, while others are implied. There are certain acts that an absolute or omnipotent sovereign can do which a state or the United States cannot do, because not warranted by our basic law nor contemplated in the formation of the American government. Under our American system of government, acts of the Legislature which contravene no express provision of the Constitution, yet violate the spirit or the implied provisions of the Constitution, are contrary to the genius and spirit of our public institutions created by the instrument; and are as void, for that reason, as if expressly prohibited. It is this species of insidious infractions which, for the time, finds moral and philanthropical support, which is most to be feared. It is not probable that a righteous and wise Legislature will pass or attempt to pass acts which are immoral, impolitic, or unphilanthropical, or which are expressly prohibited. The seductive and persuasive character of the act is apt to pass unnoticed, until the innovation is repeated, and so increased, until some startling wrong is made manifest.

Courts and judges, under our system of government are made the guardians of the minorities, and charged with the duty to protect, against the aggressions and invasions of the majorities. They are, likewise, the trustees of the Constitution in or by which the inalienable rights of their wards are preserved. If they allow the majorities to override the Constitution, to destroy

the great character, and deprive the individual or the minorities of their constitutional rights reserved to them as inalienable, then they fail to discharge their duties constitutionally imposed, and are not excusable, no matter how popular may be the aggression or invasion of the majorities on their sacred reserved rights. Mr. Madison has well said "that turbulence, violence, and abuse of power by the majority, trampling on the rights of the minority, have produced factions and commotions, and these in republics, more frequently than any other cause, have produced despotisms; and, if we go into the whole history of ancient and modern republics, we will find their destruction to have generally resulted from those causes, and we have cause to fear that, if the minorities are not protected against the majorities, the same causes here will result in the same fatal effects which they produced in those republics. Our system of government, as is well known, is one of checks and balances, seeking safety in the declared inalienable rights of the individual and of the minority against the encroachments of the majority. The wisdom and care of our fathers who devised it to thus hedge it around with defenses against the attacks of popular majorities against their excited delusions and hasty errors, as well as to guard it against the faithless and corruptible officers who administer it, cannot be doubted. It is apparent in almost every line of the Bill of Rights.

Athens once possessed a government in a measure republican and representative, but it contained no provision for the protection of the minority against the assaults and errors of the majority. Its decrees and judgments the most solemn, were subject to be revised, set aside, and annulled by popular assemblies of the citizens who, by progressive, successive innovations, en-

OF ALABAMA.

tirely changed the nature as well as the form of their constitution, and thereby introduced in the place of "representative" government corruption and anarchy, which resulted in final destruction and ruin. Such must be the fate of all governments which change with the popular will, fancy, and passion of the hour. Its only result must be mob law, violence, and virtual anarchy. Our "Bills of Rights" were intended—and so far and so long as they are regarded by the courts will continue—to protect us from the fate of other republics. The laws of nature, human as well as abstract, are the same, the world over; but the civil laws are what the people make them, but they cannot be made to override or suspend the natural ones, and we need not attempt it. If we violate the natural laws, we must pay the penalty. We cannot disregard them and escape on a technical construction. I know it is often said in opinions that all state statutes are valid, unless a prohibition thereof can be found on the printed pages of the Constitution, and that the courts must uphold them unless convinced of their invalidity beyond a reasonable doubt; but these expressions are subject to qualifications and modifications. They are plenitudes and platitudes, used as arguments to enforce the theory that state constitutions are limitations of power, and not grants thereof, as is the federal Constitution.

The Solomon of this court, Stone, C. J., in the famous case of *Sadler v. Langham,* 34 Ala. 311, has well expressed the limitations and qualifications of these guaranties, in language as follows: "On the measure of proof necessary to set aside a statute as unconstitutional the language of the adjudged cases varies. In some cases it is said that the expressed will of the Legislature ought not to be disregarded, unless the unconstitutionality be clearly demonstrated. In an-

other case it is said that we should not hold that the Legislature had exceeded its power, except in cases admitting of no reasonable doubt. See *Fletcher v. Peck,* 6 Cranch, 87 [3 L. Ed. 162] ; *Morris v. People,* 3 Denio (N. Y.) 381; *De Camp v. Eveland,* 19 Barb (N. Y.) 81; *Clarke v. People,* 26 Wend (N. Y.) 599. With due respect, we think this language entirely too strong. It indulges, in favor of legislative infallibility, the same strength of presumption as that which obtains in favor of innocence when the life or liberty of the citizen is jeoparded in the courts of criminal jurisdiction. Constitutional provisions are intended as a protection to life, liberty, and property against encroachment, intentional or otherwise, at the hands of the government. Had not the framers of our system of government supposed it possible that legislative bodies might fall into error, they would not, in their sovereign capacity, have adopted a written Constitution, superior alike over themselves and the Legislature. We cannot believe that construction a sound one, which indulges every reasonable presumption against the citizen, when the Legislature deals with his rights, and gives him the benefit of every reasonable doubt, when his life and liberty are in jeopardy before the courts of the country. A controlling purpose with the founders of our representative system was to prevent abuse and oppression by incorporating into the fundamental law a nicely adjusted system of checks and balances. Hence they divided the government of Alabama, as of most or all of the other states, into three distinct departments; and confined each department to a separate body of magistracy.—Const. of Ala. art. 2, § 1. Each of these bodies is, separately and for itself, charged with the protection and preservation of the inalienable rights of the citizen; and while we freely concede that it is the duty,

and doubtless the pleasure of each, to presume that the others will keep within the bounds of constitutional authority, yet that presumption is not conslusive; nor should we in its indulgence forget that there is committed to us, equally with the other departments, the trust of guarding and protecting the life, liberty, and property of the citizen, as guaranteed by the Constitution." In that case a statute was stricken down, the propriety or beneficence of which could not be doubted; and that sage of the law closed his opinion by quoting the Solomon of the New York court, as follows: "We adopt as our own the following language of one of New York's ablest and purest judges: '* * * Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained, by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people should amend it; and inconveniences can be borne long enough to await that process. But, if the Legislature or the courts undertake to cure defects by enforced and unnatural constructions, they inflict a wound upon the Constitution which nothing can heal. One step taken by the Legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost,

and the powers of the government are just what those in authority please to call them.'—*Oakley v. Aspinwall,* 3 N. Y. [3 Comst.] 547, 568."

The question here presented is not, of course, as to the power or right of a state or nation to provide pension or pauper laws for the maintenance of the poor, or for compensating soldiers for just services in war. The purpose and object of the bill in this case is to raise revenue, not to disburse it. The objection to the law in this case is that, while it is a classification for taxation, providing who shall bear the burdens of the government, yet it also, in effect, attempts to specify those who shall receive its charities or who shall be paid for services. Soon after the war, as is a matter of history, many of the statutes of states and acts of Congress attempted to single out this same class of citizens—the Confederate soldiers—as the subject of hostile discrimination, as by limiting their right to practice the learned professions, as well as their right to hold office; and in this matter attempted and intended to heap burdens and indignities upon them. And all this for no other reason than that they were Confederate soldiers, or gave aid and comfort to the Confederate States during the war. But be it said to the credit of our state and federal courts they held that no such discriminations could be made by the Legislatures or by Congress; that our government is and was then a government of laws, and not for men. The same states and Congress attempted to make laws discriminating in favor of the Union soldiers, and against other citizens, for no other reason than the fact that they were Union soldiers; but the courts, state and federal, with one accord held that the Legislature nor Congress had any power to make such laws. How the law can be anywise different now from what it was then I

am unable to understand. How or why the state or the federal Constitution warrants a Legislature in requiring a Union soldier to pay a tax in order to practice medicine or law in this state, while authorizing a Confederate soldier to so practice without paying any such license tax, is not susceptible of explanation satisfactory to me. I do not believe that the fundamental laws of this state or of this nation should or will allow or tolerate any such invidious distinctions and discriminations against one class of citizens. I believe—and so read the law—that both state and federal Constitutions prohibit any such discriminations from being made by the lawmaking power either by general or special statutes. Such discriminations as are made in this statute are, I take it, certainly inconsistent with the spirit, if not with the letter, of all Bills of Rights in the American Constitutions.

Not only this; but, as has been repeatedly decided by state and federal courts, such statutes are inconsistent and incompatible with the fundamental principles of the American form of free and independent government, and, being so, need no express inhibition in the Constitutions to render them void. Will any one contend that it is competent or possible for any state Legislature or Congress, or both combined, to say of twin brothers of like intelligence, habits, character, and competency that one shall pay tax to practice law or medicine, but the other shall not, for no other reason than that one was a Union soldier and the other a Confederate? Or can a man be required to pay a tax or to bear a burden of government from which others are exempt in order to practice one of the learned professions for which he is otherwise well fitted, for no other reason than the fact that he was not a Confederate soldier? If the statute in question is valid, then one answering

the description of the two cases hypothetically stated would be valid. There can be no difference as to the power to pass the one or the other. The effect upon the individual or citizen so taxed is the same in each of the three cases.

Five states—Vermont, Iowa, Wisconsin, South Carolina, and Texas—attempted to pass statutes almost identical with the statute in question, and the appellate court in each case, without dissenting voice, struck down the statute. The first three states attempted to discriminate in favor of Union soldiers, and the last two in favor of Confederate soldiers. See *State v. Shedroi,* 75 Vt. 277, 54 Atl. 1081, 63 L. R. A. 179, 98 Am. St. Rep. 825; *State v. Garbroski,* 111 Iowa, 496, 82 N. W. 959, 56 L. R. A. 570, 82 Am. St. Rep. 524; *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468; *City of Laurens v. Anderson,* 75 S. C. 62, 55 S. E. 136, 117 Am. St. Rep. 885, 9 Ann. Cas. 1003 *Ex parte Jones,* 38 Tex. Cr. R. 482, 43 S. W. 513. There are no reported cases that I can find to the contrary, and the text-writers and annotators cite the four cases above, as supporting the doctrine of the texts, that such classifications are unwarranted, and are void as discriminatory statutes. I confess that I am unable to find any authority to support the holding in this case. I do not believe that the statute has anything to stand upon, except policy and philanthropy, Fourth of July speeches, and memorial addresses. All these, I admit, are worthy objects and subjects, but I do not concede or admit that treatises or speeches on such subjects or occasions are good authority on the questions of legislative competency and constitutional limitations. This statute is clearly prohibited by our Bill of Rights and that of every other state in the Union which I have ever examined and by the amendments to the federal

Constitution which take the place of and were intended as a bill of rights to that Constitution; some being directed against the state Legislatures, and others against Congress. If it could be said that this statute does not violate the letter or spirit of any particular one of these rights enumerated as being reserved to the citizen, and thus expressly "excepted out of the general powers of government, and which shall forever remain inviolate," it certainly does violate both the letter and spirit of those inalienable rights and privileges of the citizen which he never surrendered nor conferred upon the state or the United States when the government, state or federal, was formed, and which were secured to him by the written compact or Constitution in the provision that "the enumeration of certain rights retained shall neither deny the existence of, nor impair the other inalienable rights retained by the people."—Const. Ala. 1901, § 36.

Article 9 of the Federal Constitution reads as follows: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The equal right, with other citizens, to practice a noble and worthy profession, or to pursue an honorable, lawful, and remunerative avocation, is certainly one of the citizen's inalienable rights, as much so as those of life, liberty, or property, which are specially enumerated. But, as to these enumerated rights, it does not follow that the citizen's life, liberty, or property shall not and cannot be taken, but only that such shall be taken only for the public good, and only under the same conditions that the life or liberty or property of any or all shall be taken; so, as to the business or avocation of the citizen, it does not follow that the business may not be regulated by law, and that the citizen may not be prohibited from, or re-

strained in, the practice, but only that he shall be pro-
hibited or restrained for the same causes, and under
the same conditions, that prohibit or restrain other
citizens. In England, Parliament could possibly pass
a statute like the one in question, and it would be valid,
though I am not sure as to this, for the reason that
some of the greatest English judges and law writers
have announced doctrines which, if true, would render
such an act of Parliament void. Mr. Andrews, in his
recent and estimable work on American Law (vol. 1,
pp. 380-382), has stated (I think) the correct doctrine
as to the rights of the citizen and the powers of state
Legislatures, which he supports by quotations from the
greatest lawyers of this country, and the ablest judges
of the highest courts of this country. From this work
I take the following: " Mr. Pinckney, arguing the
case of *McCulloch v. State of Maryland,* 4 Wheat. 316
[4 L. Ed. 579], says: 'The authority of the Legislature
in state government is not unlimited. There are sev-
eral limitations to their legislative authority. First,
from the nature of all government, especially of re-
publican government, in which the residuary powers
of sovereignty, not granted specifically, by inevitable
implication, are reserved to the people; secondly, from
the express limitations contained in the state Constitu-
tions; and, thirdly, from the express prohibitions to
the states contained in the United States Constitution.'
The British Constitution knew no such a thing as a
division of the exercise of legislation between Parlia-
ment and the people. They knew no such thing as a
constitutional convention. Political legislation—that
is, legislation by which the Constitution of the state is
changed—must emanate from the people. This results
from the establishment of a republican form of govern-
ment. Judge Cooley quotes without dissent the opin-

ion of Chief Justice Denio that to the state Legislature is committed the whole lawmaking power which the people did not expressly or impliedly withhold. The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the lawmaking authority as strong as though a negative were expressed in each instance. And the same great jurist himself announced the salutary principle that, although no express prohibition can be found, he entertained no doubt that, should state Legislatures undertake to abolish the whole system of local self-government, it would be the duty of the judiciary to hold the act void. The case of *Wilkinson v. Leland* [2 Pet. 628, 7 L. Ed. 542] was a case arising under the law of Rhode Island, which had no written Constitution other than the principles and usages which had been observed from time immemorial, and which might be said to include the British Constitution, but certainly nothing stronger than the limitations imposed upon the British Parliament. Mr. Webster argued that it was of no importance whether there were any restrictions to the power of the Legislature imposed by the Constitution; for, if at this period there was not a general restraint on legislative power, there was an end to private property. He insisted that without prohibitions in the Constitution the Legislature were restrained from committing flagrant acts—acts subverting the great principles of republican liberty and of the social compact. Mr. Justice Story, delivering the opinion, held that, even if an absolute authority could be ascribed under the English Constitution and that of Rhode Island before the Revolution, it could scarcely be imagined that that great event could have left the people of that state subject to

its uncontrolled and arbitrary exercise, and also that as to the absolute power of legislation it could not be imagined that it lurked under any general grant of legislative authority. The people ought not to be presumed to part with rights so vital to their security and well-being without very strong and direct expressions of intention. While the extent of the power of the Legislature is clearly limited by general principles of republican government, irrespective of express prohibitions, there is no enumeration of the subject of state legislation; but all proper subjects of legislation may be exercised by this agency of the people. A proposition universally acceded to is that the state Constitution is not a grant of power to the legislative department. This statement of the proposition involves a misleading implication. If regarded in connection and contrasted with the United States Constitution, the proposition states a principle distinguishing between the nature of the different instruments, namely, that the federal Constitution is a grant of power over enumerated objects, of state legislation, while the state Constitution does not attempt to enumerate the objects; but, as we have seen, the state Legislature is not a creative body having original sovereignty, but exists, when regarded from the standpoint of a question between an individual of a state or of the people of the state, by the grant to this designated body of the legislative power, and this grant is the only warrant or authority which the Legislature has for performing legislative acts. The practical point to be observed by the student and jurist is not to allow the general expression to convey the conclusion that there rests in the Legislature of the state any such supreme and absolute authority as was claimed for the British Parliament by Parliament itself and by the most ardent advocates of its extreme

omnipotence. Mr. Justice Baldwin held that, aside from any express prohibition, the state Legislature could not take private property for private purposes: [*Bonaparte v. Camden & A. R. Co.*], 1 Baldw. 223 [Fed. Cas. No. 1617]. See *Taylor v. Porter,* 4 Hill [N. Y.] 140 [40 Am. Dec. 274] ; Id. ['Dana (Ky.) 421], 25 Am. Dec. 155, ante p. 23. 'The Legislature possesses no inherent power of making laws, and no powers but such as are derived from the Constitution, subject to its limitations and restrictions; the leading one being that it shall make no law contrary to the Constitution. Beyond this, it no more represents the sovereignty of the people than either of the other branches of government does; and, when it assumes to pass an act contrary to the Constitution, it is not a legislative act, and cannot have the force of law.—*Charles River Bridges v. Warren Bridge,* 11 Pet. 644 [9 L. Ed. 773].' "

A state Legislature is by no means a sovereign power. It is not a creator, but a creature of the Constitution. It is merely one of the three general agents of the people who are the true and only sovereigns under our American form of government. Judge Story said on this subject: "The Legislature of Massachusetts is, as I have already said, in no just sense the sovereign of the state. The sovereignty belongs to the people of the state in their original character as an independent community, and the Legislature possesses those attributes of sovereignty, and those only, which have been delegated to it by the people of the state, under its Constitution." The principle declared in the Declaration of Independence of equality of rights is a part of our written and unwritten Constitutions. Mr. Andrews, in his American Law (vol. 1, p. 22), has so forcefully expressed the main idea for which I contend, that I shall again quote him: "In studying national institutions there

is no one thing so important as to begin with the fundamental first principles upon which the whole structure is founded, and which ramifies to its remotest parts. The expression of that principle is familiar to every schoolboy, but its real importance is not appreciated by the American people, and it is safe to assume that it is violated more often by those who exercise the trust of legislation than by any other class of citizenship. *Equality of right is the first principle of American jurisprudence.* 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, and among these are life, liberty, and the pursuit of happiness; that to secure these rights governments are instituted among men deriving their just powers from the consent of the governed.' As we have seen the germ of these political ideas took root in the human heart centuries ago, but they had lived with the cloister and the scholar, they had cast a feeble, fitful gleam of light over an ancient people, but they became, to change the metaphor, the chief corner-stone of a political structure for the first time in the United States. The Declaration of Independence is not a part of the written Constitution of the nation, but the principles declared in this declaration of equality are parts of the written and unwritten constitution of the people, and are everywhere treated as practical principles, and not, as many Americans supposed, mere glittering generalities to embellish Fourth of July orations or postprandial festivities."

This same doctrine was clearly and forcefully announced by this court at an early date in the case of *In re Dorsey,* 7 Port. 293-419. Each judge wrote at length upon this subject, and the report of the case covers 127 pages. The first four headnotes to that

case state the principles I contend for in this case. I quote them:

"(1) The object to be attained by the people when assembled in convention was not the formation of a mere government. It was to form a government with clearly defined and limited powers, in order that the general, great, and essential principles of liberty and free government might be recognized.

"(2) The declaration of rights is an enumeration of certain rights which are expressly retained and excepted out of the powers granted, and the particular enumeration of rights contained in the declaration cannot be construed to disparage or deny others retained by the people.

"(3) The declaration of rights is the governing and controlling part of the Constitution, and all its general powers are to be expounded, and their operation extended or restrained, with reference to it.

"(4) By the declaration each citizen is entitled to all the rights or privileges, which any other citizen can enjoy or possess. Every citizen has the right to aspire to office, or to pursue any lawful avocation; and this general equality is one of the fundamental rights of each citizen, and the power to destroy this equality must be expressly given or arise by clear implication, or it can have no legal existence."

In this case Judge Goldthwaite said: "I consider the Declaration of Rights as the governing and controlling part of the Constitution; and with reference to this are all its general provisions to be expounded, and their operation extended or restrained. The declaration itself is nothing more than an enumeration of certain rights, which are expressly retained and excepted out of the powers granted; but as it was impossible, in the nature of things, to provide for every case

of exception, a general declaration was added that the particular enumeration should not be construed to disparage or deny others retained by the people. What these other rights are which are thus reserved may be readily ascertained by a recurrence to the preamble to the Declaration of Rights. The object to be attained by the people, when assembled in convention, was not the formation of a mere government, because such might, and in many cases would be arbitrary and tyrannical, although democratic in its form. It was to form a government with clearly defined and limited powers, in order that 'the general, great and essential principles of liberty and free government might be recognized and established.' The General Assembly is not expressly prohibited from enacting laws requiring political test oaths to be taken, nor from excluding some of its citizens from the pursuit of certain trades or avocations, yet no one would contend that any such laws could be operative, because it is evident that they are adverse to the principles of liberty and free government."—7 Port. 359, 360. "The great object of all free governments has been to secure an equal administration of the laws. But the people of the United States have attempted the still more difficult task of binding even the legislative department of the government by an organic law. In England, when the principles of civil liberty were not as well understood or as firmly established as they are at the present day, eminent men have at different times asserted that the parliament was not omnipotent, and fearlessly declared those principles of civil liberty, which have since then in this country been declared and placed beyond all doubt by their assertion as part of the organic law of the land. Thus we find Lord Chief Justice Hobart, asserting that 'if a statute says that a man shall be a judge in his own

cause, such a law, being contrary to natural equity, shall be void.' And again, Lord Coke, in *Bonham's Case* declared that 'where an act of Parliament is against common right or reason, or repugnant, or impossible to be performed, the common law shall adjudge it to be void.' Of this declaration Lord Holt, in the case of the *City of London and Wood,* said 'that the observation of Lord Coke was not extravagant, but was a very reasonable and true saying.' It is true that in that country these opinions were then, and have since been, questioned as applicable to the British Constitution, though it is conceded by a recent English writer that such is the law of the United States.—See Dwarris on Statutes, 646. Indeed, it cannot be necessary at this day to cite authorities to establish the principle that a law contravening the Constitution is void, and that the judiciary have power to declare it so. In the case of *Calder v. Bull,* 3 Dall. 386 [1 L. Ed. 648], Judge Chase, impelled by the same strong sense of justice, and animated by the same principles of liberty, which influenced the British judges, just quoted, takes the high ground 'that there are certain vital principles in our free republican government which will determine and overrule an apparent and flagrant abuse of legislative power, as to authorize manifest injustice by positive law, or to take away that security for personal liberty, or private property, for the protection of which government was established. An act of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact cannot be considered a rightful exercise of legislative authority."—7 Port. 374-376. "Judge Iredell, in the same case, held a different doctrine maintaining that, if a law was within the general scope of constitutional power, no court could pronounce it void, because it was, in the judg-

ment of such court, contrary to the principles of natural justice. It is not necessary to decide the abstract question, mooted by eminent men, whether the very principles upon which our government is founded do not forbid the passage of laws which are repugnant to natural justice and equity, or which violate the principles of civil liberty, because the people who formed the Constitution of Alabama have provided by the organic law of the state for the examination by the judiciary of all laws having this tendency, whether expressly forbidden by the Bill of Rights or not."—7 Port. 377. "By this it appears, not only that the rights asserted in this instrument or reserved out of the general powers of government, but also that this enumeration shall not disparage others not enumerated, and that any act of the Legislature which violates any of these asserted rights, or which trenches on any of these great principles of civil liberty, or inherent rights of man, though not enumerated, shall be void."—7 Port. 378.

This principle declared in *Dorsey's Case* has always been followed in this state. It was expressly referred to in the world-famous case of *Yuille,* 3 Ala. 140 [36 Am. Dec. 441], as follows: "The decision of this court in the matter of *J. L. Dorsey,* 7 Port. 295, has been referred to as sustaining the position that the act is unconstitutional. But the ground upon which the law in that case was held to be void was not that the Legislature could not regulate the matter and provide for the licensing of attorneys at law, but because the act was partial, and did not operate alike on all the citizens of the state." It was also referred to in the case of *Kentz v. Mobile,* 120 Ala. 633, 24 South. 654, as follows: "Under this provision, each citizen is entitled to all the rights or privileges which any other citizen can enjoy or possess, and every citizen has the right to aspire to

and hold any office, or pursue any lawful vocation, any other citizen may hold or pursue, except wherein the power to destroy this equality is expressly given or arises by clear implication from some other part of the fundamental law.—*Dorsey's Case,* 7 Port. 293; Cooley, Const. Lim. 485." It is true that in this case the particular provision of the Constitution (section 2 of article 1) is omitted from the present Constitution, but the same fundamental principle still remains in the Bill of Rights.

It is true that there are expressions of dicta in opinions of this court; beginning with the case of *Dorman v. State,* 34 Ala. 219, 236, which would seem to conflict with my contention, and what is said in our other cases and those of the Supreme Court of the United States and by those text-book writers which I have tried to follow. The one most often quoted and which, if taken literally, would so conflict, is this: "There are no limits to the legislative power of the state government, save such as are written upon the pages of the state or federal Constitution." This, of course, is not literally true, and was evidently not intended by the writer to be so understood. The laws of nature are, of course, limitations upon this legislative power. Some acts have been declared void, because the Legislature attempted to enact a law that was not within legislative competency, though not prohibited by the state or federal Constitution, because not necessary to be expressly prohibited, for the reason that the Legislature could not have made such an act valid even if the Constitution had attempted to expressly authorize it. Both Chief Justice Marshall and Justice Johnson in the famous case of *Fletcher v. Peck,* 6 Cranch, 135, 141, 3 L. Ed. 162, referred to such void acts. Marshall said: "It may well be doubted whether the nature of society and

of government does not prescribe some limits to the legislative power." Johnson said: "I do not hesitate to declare that a state does not possess the power of revoking its own grants, but I do it on a general principle, on the reason and nature of things, a principle which will impose laws even on the Deity." Justice Somerville in the case of *Davis v. State,* 68 Ala. 58, 62 (44 Am. Rep. 128), after quoting the phrase from *Dorman's Case,* which is quoted above, said that the axiom announced and quoted should "be taken as qualified by the necessary implication that the act, which is subjected to scrutiny, is purely legislative in its nature and not judicial nor executive."

Judge Cooley, in treating of the powers of and limitations upon state Legislatures, says: "It is natural * * * that we should incline to measure the power of the legislative department in America by the power of the like department in Britain; and to concede without reflection that whatever the Legislature of the country from which we derive our laws can do may also be done by the department created for the exercise of legislative authority in this country. But, to guard against being misled by a comparison between the two, we must bear in mind the important distinction already pointed out, that with the Parliament rests practically the sovereignty of the country, so that it may exercise all the powers of government if it wills so to do; while, on the other hand, the Legislatures of the American states are not the sovereign authority, and, though vested with the exercise of one branch of the sovereignty, they are nevertheless in wielding it hedged in on all sides by important limitations, some of which are imposed in express terms, and others by implications which are equally imperative."—Const. Lim. (6th Ed.) p. 102. He also quotes Denio, C. J., as stating

the law correctly upon this subject, and so does Walker, J., *Dorman's Case,* quote the same judge and from the same case.—*People v. Draper,* 15 N. Y. 532, 543. The case of *People v. Draper* is therefore approved and followed by Mr. Cooley and by Judge Walker in *Dorman's Case.* The quotation is as follows: "The people in framing the Constittuion," says Denio, C. J., "committed to the Legislature the whole lawmaking power of the state, which they did not expressly or impliedly withhold. Plenary power in the Legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden. I do not mean that the power must be expressly inhibited, for there are but few positive restraints upon the legislative power contained in the instrument. The first article lays down the ancient limitations which have always been considered essential in a constitutional government, whether monarchial or popular; and there are scattered through the instrument a few other provisions in restraint of legislative authority. But the affirmative prescriptions and the general arrangements of the Constitution are far more fruitful of restraints upon the Legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the lawmaking authority as strong as though a negative was expressed in each instance; but independently of these restraints, express or implied, every subject within the scope of civil government is liable to be dealt with by the Legislature."

So it appears that none of the authorities—not even *Dorman's Case*—hold that any act of a state Legislature is valid unless expressly prohibited in the pages of the state or federal Constitution. The great majority of the limitations, as well as of the grants, are implied—this for the reason that it would be impossible to enumerate all of either class. It is very true, as held in *Dorman's Case,* and in hundreds of other cases, both state and federal, that the federal Constitution is a grant of power to Congress, and that state Constitutions are only limitations upon the power of the Legislature. It is also true that the government of the United States has no power except those granted, and that the state has all power not reserved or excepted by the Constitution. But these are merely general axioms. They are not so absolutely and so literally true as to admit of no qualifications or limitations or explanations. The federal government has more implied grants of power than express ones; so the states have more implied limitations upon their powers than express ones. Constitutions are general statements of fundamental principles, and not schedules or itemized accounts of powers granted or reserved. Most all of the rights and powers granted or reserved are implied from the grant or reservation of other rights and powers expressly granted or reserved. While it is a well and universally accepted axiom that the federal Constitution is a grant of governmental power, yet there are prohibitions, inhibitions, and limitations of power contained therein, both as to Congress and state Legislatures. While it is likewise true that a state Constitution is a limitation upon, and not a grant of powers to, the Legislature, yet there is a great number of grants of power, in terms, to the Legislature, to the judiciary, and to the executive department. The most casual reading

will disclose this; so these axioms, while true in the
main, are themselves subject to exceptions, qualifica-
tions, and limitations.  Mr. Cooley says that declara-
tions or Bills of Rights are "declaratory of the general
principles of republican government, such as that all
freemen, when they form a social compact, are equal,
and no man, or set of men, is entitled to exclusive, sep-
arate public emoluments or privileges from the commu-
nity but in consideration of public services; that abso-
lute, arbitrary power over the lives, liberty, and prop-
erty of freemen exists nowhere in a republic, not even
in the largest majority; that all power is inherent in
the people, and all free governments are founded on
their authority, and instituted for their peace, safety,
happiness, security, and the protection of property."
Mr. Tiedeman says that the private and inalienable
rights of citizens do not rest upon the mandate of the
law as a source; that they belong to man in a state of
nature.  They are natural laws, existing under the law
of reason.—Tiedeman, Lim. Pol. Pow. § 1.  Our Consti-
tution ordains and declares, among other things: "That
all men are equally free and independent; that they are
endowed by their Creator  with  certain  inalienable
rights; that among these are life, liberty and the pur-
suit of happiness."  Second.  That no law shall be pass-
ed, conferring any "special privileges or immunities."
—Const. § 22.  If a statute denies to one man the right
to practice medicine or law without paying a privilege
or license tax, but allows another man to practice such
profession or business without a license or  tax,  are
those two men "equally free. and independent"? Has
their equal pursuit of happiness not been denied? Does
the statute which attempts to make this discrimination
not confer special privileges or immunities?  If it does
not, I submit it is difficult to suppose one that would

violate these provisions. The federal Constitution, as to the "privileges and immunities" of the citizen, among other things provides that the citizens of each state shall be entitled to all privileges and immunities of citizens of the several states, and that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

Is it possible that the statute in question does not offend any of these provisions? If not, how could the "privileges and immunities" of a citizen be discriminated against? If to require a certain man or a certain class of men to pay for the privilege of earning a living or practicing a profession, when others are not so required, is not an unconstitutional discrimination, I confess it is difficult to say what would be. I maintain that these provisions in the state and federal Constitutions require and guarantee equality of privilege. If the right to practice one's chosen profession is not an inalienable right and an essential privilege, protected by the Constitution, what is, or could be? It is very true that it is difficult to enumerate all of the citizen's inalienable rights, privileges, and immunities which the state cannot by its statutes invade or disregard. The Supreme Court of the United States, on one occasion, declined to make the attempt.—*Conner v. Elliott,* 18 How. 591, 15 L. Ed. 497. But that same court, and this court, and many others have repeatedly held that it is one of the privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit, and do so without unreasonable regulations; that he is not to be deprived of this privilege without due process of law, and that, in the exercise of this right and privilege, he shall have the equal protection of the law. In fact, this is expressed in the words of the federal Con-

stitution. I hold that these reserved "rights," "privileges," and "immunities" of the citizen cannot be invaded by state statutes nor by courts without sapping the very foundations of republican government. A republican government is not merely a government of the people, but it is a free government. Unless free it is republican in name only, and not in truth; and any state that will unjustly and arbitrarily discriminate against a part of its citizens in earning a living is not republican. If a state enforces such arbitrary restrictions as are enforced in this case, for no other reason than that the citizen is a Union soldier, or not a Confederate soldier, and for the benefit of a favored few, it takes away the citizen's property or its equivalent, the right to earn it by labor, and thereby it does seem to me violates the fundamental principles of free government. There is certainly no more sacred right or privilege than that to pursue a lawful business in a lawful manner. It is nothing more nor less than the sacred right of labor. This right is not at all inconsistent with any of those wholesome and necessary regulations which have been found to be necessary in every state. It is not inconsistent with the rights granted to certain corporations and . individuals to build railroads, canals, and ferries, which involve a charge upon the public, and the exercise of the right of eminent domain. The public obtains a consideration for the grants of these franchises and privileges, in the investment of large amounts of capital in public improvements, for the development of the country. These rights and privileges are entirely different from those of ordinary businesses and callings which all citizens may lawfully follow, as their inclination dictates and as competition may justify. This right or privilege for which I contend, and which this statute in question arbitrarily invades, is not at all inconsistent

[McLendon v. The State.]

with laws which require a license to practice or a certificate as a qualification to practice certain professions. The interest of the public may require this, for preparation and qualification should be shown, before the applicant is allowed to experiment on the public. But these noble professions and honorable avocations are, and should be, open or closed to all alike. None should be excluded or handicapped in this race to obtain honors. The right and privilege of the citizen which I contend for is not inconsistent with proper or necessary police regulation; but the Legislature cannot, under the guise of police regulation, interfere with inalienable rights, privileges, and immunities which the Constitution guarantees to him, and which are reserved, expressly or impliedly, to him, and thus taken out from under governmental control. If the act in question is valid, then the mere ipse dixit of the Legislature assigns the learned professions and the worthy employments mentioned in it to one set of men without money and without price, and to all other classes only upon condition that they pay for them. It was the evident and express purpose of the last three amendments to the federal Constitution to secure the freedom of the negro race, and to secure to that race the same "privileges and immunities" which were accorded to other citizens; but the amendments, especially the fourteenth, are held to be broad enough to protect all citizens of the United States in the exercise of their common rights, immunities, and privileges against state legislation. Therefore, any state statute which discriminates against certain individuals of the same class, or which arbitrarily classifies the citizens for the purpose of discriminating against a class, surely deprives those discriminated against of their civil rights which are secured to all by the Constitution; and is therefore necessarily in vio-

lation of this provision of the federal Constitution. "The terms, 'privileges and immunities,' are not new in the amendment. They were in the Constitution before the amendment was adopted. They are found in the second section of the fourth article, which declares that 'the citizens of each state shall be entitled to all privileges and immunities of citizens of the several states,' and they have been the subject of frequent consideration in judicial decisions. In *Corfield v. Coryell* [Fed. Cas. No. 3230], Mr. Justice Washington said he had 'no hesitation in confining these expressions to those privileges and immunities which were, in their nature, fundamental, which belong of right to citizens of all free governments, and which have at all times been enjoyed by the citizens of the several states which compose the Union, from the time of their becoming free, independent, and sovereign'; and, in considering what those fundamental privileges were, he said that perhaps it would be more tedious than difficult to enumerate them, but that they might be 'all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole.' This appears to me to be a sound construction of the clause in question. The privileges and immunities designated are those which of right belong to the citizens of all free governments. Clearly among these must be placed the right to pursue a lawful employment in a lawful manner, without other restraint than such as equally affects all persons."—*Slaughterhouse Cases*, 16 Wall. (U. S.) 97, 21 L. Ed. 394. "In all * * * cases there is a recognition of the equality of right among

citizens in the pursuit of the ordinary avocations of life, and a declaration that all grants of exclusive privileges in contravention of this equality are against common right and void. This equality of right, with exemption from all disparaging and partial enactments in the lawful pursuits of life, throughout the whole country, is the distinguishing privilege of citizens of the United States. To them everywhere all pursuits, all professions, all avocations are open without other restrictions than such as are imposed equally upon all others of the same age, sex, and condition. The state may prescribe such regulations for every pursuit and calling of life as will promote the public health, secure the good order, and advance the general prosperity of society, but, when once prescribed, the pursuit or calling must be free to be followed by every citizen who is within the conditions designated, and will conform to the regulations. This is the fundamental idea upon which our institutions rest, and unless adhered to in the legislation of the country our government will be a republic only in name. The fourteenth amendment in my judgment makes it essential to the validity of the legislation of every state that this equality of right should be respected."—16 Wall. 109, 110, 21 L. Ed. 394. As was said by this court, that of Connecticut, and that of the United States: "That only is a free government, in the American sense of the term, under which the inalienable right of every citizen to pursue his happiness is unrestrained, except by just, equal, and impartial laws."

The Declaration of Independence was the first political act of the American people in their independent, sovereign capacity. It laid the foundation of our national existence upon this broad proposition; and the first clause of the first article of our state Constitution

is a literal copy of it, and it is therefore significant. That broad proposition is this: "That all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." Here "we have the great threefold division of the rights of freemen, asserted as the rights of man. Rights to life, liberty, and the pursuit of happiness are equivalent to the rights of life, liberty, and property. These are the fundamental rights which can only be taken away by due process of law, and which can only be interfered with, or the enjoyment of which can only be modified, by lawful regulations necessary or proper for the mutual good of all; and these rights, I contend, belong to the citizens of every free government. For the preservation, exercise, and enjoyment of these rights the individual citizen as a necessity must be left free to adopt such calling, profession, or trade as may seem to him most conducive to that end. Without this right he cannot be a freeman. The right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property and right. Liberty and property are not protected when these rights are arbitrarily assailed."—16 Wall. 116, 21 L. Ed. 394. Our own court has spoken in its own language, as well as quoted from others, the same precepts which I have tried to state in this dissent. In the case of *South & North Alabama Railroad Co. v. Morris,* 65 Ala. 193, 199, 200, this court, in a unanimous opinion, after quoting several of our Bills of Rights, said: "The clear legal effect of these provisions is to place all persons, natural and corporate, as near as practical upon a basis of equality in the enforcement and defense of their rights in courts of justice in this state, except so far as may be otherwise

provided in the Constitution. This right, though subject to legislative regulation, cannot be impaired or destroyed under the guise or device of being regulated. Justice cannot be sold or denied by the exaction of a pecuniary consideration for its enjoyment from one, when it is given freely and open-handed to another, without money and without price. Nor can it be permitted that litigants shall be debarred from the free exercise of this constitutional right by the imposition of arbitrary, unjust, and odious discriminations, perpetrated under color of establishing peculiar rules for a particular occupation. Unequal, partial, and discriminatory legislation, which secures this right to some favored class or classes, and denies it to others, who are thus excluded from that equal protection designed to be secured by the general laws of the land, is in clear and manifest opposition to the letter and spirit of the foregoing constitutional provisions. It was forcibly said by the Supreme Court of Tennessee in *Wally's Heirs v. Kennedy*, 2 Yerg. [Tenn.] 554 [24 Am. Dec. 511] : 'The right of every individual must stand or fall by the same rule or law that governs every other member of the body politic or land under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were it otherwise, odious individuals and corporations would be governed by one law, and the mass of the community, and those who made the law, by another; whereas the like general law, affecting the whole community equally, could not have been passed.' In *Holden v. James*, 11 Mass. 396, 6 Am. Dec. 174, the Supreme Court of Massachusetts said: 'It is manifestly contrary to the first principles of civil liberty and nat-

[McLendon v. The State.]

ural justice, and to the spirit of our Constitution and
laws, that any one citizen should enjoy privileges and
advantages which are denied to all others under like
circumstances, or that one should be subject to losses,
damages, suits, or actions from which all others, under
like circumstances, are exempted.' The court in *Unit-
ed States v. Cruikshank,* 92 U. S. 542, 555 [23 L. Ed.
588], per Waite, C. J., used the following language, in
discussing the foregoing constitutional clause:  'The
equality of the rights of citizens is a principle of re-
publicanism. Every republican government is in duty
bound to protect all its citizens in the enjoyment of
this principle, if within its power. That duty was orig-
inally assumed by the states, and it still remains there.'
—*Ward v. Flood,* 48 Cal. 36 [17 Am. Rep. 405]."

I know it is contended by some that the omission
from the Constitution of 1901 of section 2 of the Bill
of Rights contained in the Constitution of 1875 has the
effect to now authorize the state Legislature to deny
the equal protection of its laws to its citizens. I do
not think so, and I am sure not a member of that con-
vention had any such idea.  ·This was not the purpose
of the omission. Its only purpose was to prevent this
section from being in conflict with the new article as
to franchise and elections, and to authorize statutes
to carry into effect the new provisions as to elections
and the right to vote. It was never intended to author-
ize arbitrary discriminations against the civil rights of
any citizen or class of citizens. As I have above shown,
if we need an express provision against such statutes
as the one in question, we have it in sections 1, 22, 35,
and 36 of the state Constitution, and in articles 4 and
14 of the federal Constitution. I must say that I re-
joice in the fact that a majority of this court think
that the classification and discrimination attempted to

be made in this statute is unwarranted and void, because in violation of the federal Constitution, but the decision in this case goes to uphold the statute, because one of the majority, Brother SIMPSON, thinks the exception only is void, and that the statute must read as if the exception were stricken therefrom. I regret that I cannot agree with him, because, if his contention is true, then the statute is a proper one, and should be enforced; but how a Confederate soldier can be made to pay this tax when the only authority for it is this statute, and the statute in terms says he is excepted therefrom, or shall not pay it, is more than I can understand. If the statute except the Confederate soldier, and the courts make him pay it, then it seems to me that the courts make the law and impose the tax. This is not the office or function of courts. They construe statutes, but do not make them. Brother SIMPSON'S construction seems to me to amount to saying this: "The Legislature tried to make an invalid law, but failed in the attempt. They could have made a valid one if they had left off the exceptions, so we will strike off the exceptions—the invalid part—and make it valid, by including the class which the Legislature attempted to exclude." This is not construction, but legislation, pure and simple.

A case very similar to this is that of *Connolly v. Union Sewer Pipe Co.*, 184 U. S. 540, 560, 22 Sup. Ct. 431, 439 (46 L. Ed. 679). In that case a state Legislature had passed a statute against monopolies and excepted from its operation farmers; and the court held the classification bad, the exception void, and the whole statute invalid. The court in that case said: "The difficulty is not met by saying that, generally speaking, the state when enacting laws may in its discretion make a classification of persons, firms, corporations,

[McLendon v. The State.]

and associations in order to subserve public objects; for this court has held that a classification must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. * * *But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the fourteenth amendment forbids this. * * * No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government. * * * The power to tax persons and property is an incident of sovereignty, and the extent to which it may be exerted has been indicated in numerous cases. Taxing laws, it has been well said, furnish the measure of every man's duty in support of the public burdens and the means of enforcing it. A tax may be imposed only upon certain callings and trades, for, when the state exerts its power to tax, it is not bound to tax all pursuits or all property that may be legitimately taxed for governmental purposes. It would be an intolerable burden if a state could not tax any property or calling, unless, at the same time, it taxed all property or all callings. Its discretion in such matters is very great, and should be exercised solely with reference to the general welfare as involved in the necessity of taxation for the support of the state. A state may in its wisdom classify property for purposes of taxation, and the exercise of its discretion is not to be questioned in a court of the United Staes, so long as the classification does not invade the rights secured by the Constitution of the United States. But different considerations control when the state, by legislation, seeks to regulate the enjoyment of rights and the pursuit of

callings connected with domestic trade. In prescribing regulations for the conduct of trade, it cannot divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. It is one thing to exert the power of taxation so as to meet the expenses of the government, and at the same time, indirectly, to build up or protect particular interests or industries. It is quite a different thing for the state, under its general police power, to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce. Such a statute is not a legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates."—184 U. S. 562, 563, 22 Sup. Ct. 440, 46 L. Ed. 679. "If different sections of a statute are independent of each other, that which is unconstitutional may be disregarded, and valid sections may stand and be enforced. But, if an obnoxious section is of such import that the other sections without it would cause results not contemplated or desired by the Legislature, then the entire statute must be held inoperative. The first section of the act here in question embraces by its terms all persons, firms, corporations, or associations of persons who combine their capital, skill, or acts for any of the purposes specified, while the ninth section declares that the statute shall not apply to agriculturalists or live stock dealers in respect of their products or stock in hand. If the latter section be eliminated as unconstitutional,

[Adler v. Martin.]

then the act, if it stands, will apply to agriculturalists and live stock dealers. Those classes would in that way be reached and fined, when evidently the Legislature intended that they should not be regarded as offending against the law even if they did combine their capital, skill, or acts in respect of their products or stock in hand. Looking then at all the sections together, we must hold that the Legislature would not have entered upon or continued the policy indicated by the statute, unless agriculturalists and live stock dealers were excluded from its operation and thereby protected from prosecution. The result is that the statute must be regarded as an entirety, and in that view it must be adjudged to be unconstitutional as denying the equal protection of the laws to those within its jurisdiction who are not embraced by the ninth section."—184 U. S. 565, 22 Sup. Ct. 441, 46 L. Ed. 679.