Lee GUILLIAMS, et al., Respondents,

v.

The COMMISSIONER OF REVENUE, Relator.

No. 50720.

Supreme Court of Minnesota.

Oct. 24, 1980.

Warren Spannaus, Atty. Gen., and Paul R. Kempainen, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for relator.

Robert W. Johnson, St. Paul, for respondents.

SIMONETT, Justice.

Lee and Sandra Guilliams filed state income tax returns for 1975 and 1976, reporting no tax for 1975 and $175.13 for 1976. After an audit, the Commissioner of Revenue issued his assessment order of August 28, 1978, finding that the taxpayers should have applied the farm loss modification law, which limits the amount of farm loss a taxpayer may offset against nonfarm income, and assessed a tax of $587.65 on the first return and $766.65 on the second.

The taxpayers appealed to the tax court, which by its order of October 18, 1978, reversed the commissioner, holding the farm loss modification law was unconstitutional.[1] Relator, the Commissioner of Revenue, appeals to this court. We reverse.

The question is the constitutionality of Minnesota's farm loss modification law, enacted by the 1973 legislature (1973 Minn. Laws, ch. 737) and codified as Minn.Stat. § 290.09, subd. 29.[2] Before stating the facts

---

1. Our recent case of *In the Matter of the Petitions of McCannel to Review Objections to Real Estate Taxes*, 301 N.W.2d 910 (Minn. 1980) holds the tax court, as essentially an administrative agency, has jurisdiction to determine the constitutionality of tax statutes when, in the first instance the constitutional issue is raised in the district court before the case is transferred to the tax court. *See* Minn. Stat. § 271.01, subd. 5 (1978).

This case originates in the tax court. Since constitutional questions were raised, the proceeding should have been brought in district court. Since, however, *McCannel* has only just been announced and since the issue is now here, we will entertain the appeal.

2. Minn.Stat. § 290.09, subd. 29 (1978), provides:

Subd. 29. Deductions attributable to farming. (a) Definitions. For purposes of this subdivision, income and gains and expenses and losses shall be considered as "arising from a farm" if such items are received or incurred in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife, and all operations incident thereto, including but not limited to the common use of "hedging".

of Mr. and Mrs. Guilliams' situation, it might be well to describe the statute involved and the reasons for its enactment. The law limits the amount of nonfarm income a taxpayer can use to offset farm losses. It works in this fashion:

First, all income "arising from a farm" may be freely offset by farm loss.

Second, any remaining net farm loss may fully offset nonfarm income if nonfarm income is $15,000 or less.

Third, if nonfarm income is above $15,000, a reduction formula is used to determine the amount of farm loss which may be used as an offset. This available deduction decreases as the taxpayer's nonfarm income increases. The result of the reduction formula is to give a taxpayer

with nonfarm income of $22,500 no offset, regardless of actual farm loss suffered.

Fourth, notwithstanding the above, any farm loss in the form of interest or taxes may be taken as a deduction by the taxpayer in the current year.

Fifth, any unused farm loss—remaining as a result of the above rules—may be carried back 3 years or carried forward 5 years to offset eligible income (eligibility to be determined by the same rules as above).

It appears the statute was intended to curb a popular tax shelter device whereby substantial sums of nonfarm income are sheltered by farm losses.[3] The problem

(b) Deductions limited. Except as provided in this subdivision, expenses and losses, except for interest and taxes, arising from a farm shall not be allowed as deductions in excess of income and gains arising from a farm.

(c) Deductions allowed; carryover deductions. For taxable years beginning on or after January 1, 1974, expenses and losses arising from a farm or farms shall be allowed as deductions up to the amount of the income and gains arising from a farm or farms in any taxable year, plus the first $15,000 of non-farm gross income, or non-farm taxable net income in the case of a corporation, provided however that in any case where non-farm income exceeds $15,000, the maximum allowable amount of $15,000 shall be reduced by twice the amount by which the non-farm income exceeds the amount of $15,000. Any remaining balance of the deductions shall be carried back three years and carried forward five years, in chronological order, provided, however, that in any case in which the taxpayer elects a net operating loss carryforward under section 172(b)(3)(E) of the Internal Revenue Code of 1954, as amended through December 31, 1976, such losses shall not be carried back but shall only be carried forward.

Current expenses and losses shall be utilized as deductions in any taxable year, to the extent herein allowable, prior to the application of any carryback or carryover deductions. In any event, the combined amounts of such current expenses and losses and carryback or carryover deductions shall be allowed as deductions up to the amount of the income and gains arising from a farm or farms in any taxable year, plus the first $15,000 of non-farm gross income, or non-farm taxable net income in the case of a corporation, provided however that in any case

where non-farm income exceeds $15,000, the maximum allowable amount of $15,000 shall be reduced by twice the amount by which the non-farm income exceeds the amount of $15,000.

(d) Shareholders separate entities. For purposes of this subdivision, individual shareholders of an electing small business corporation shall be considered separate entities.

(e) Special period of limitation with respect to farm loss limitation carrybacks. For the purposes of sections 290.46 and 290.50, if the claim for refund relates to an overpayment attributable to a farm loss limitation carryback under this subdivision, in lieu of the period of limitation prescribed in sections 290.46 and 290.50, the period of limitation shall be that period which ends with the expiration of the 15th day of the 46th month (or the 45th month, in the case of a corporation) following the end of the taxable year of the farm loss which results in the carryback. No deduction or refund shall be allowed on 1974 returns for farm losses which have been previously carried back to earlier years and for which a tax refund or reduction has been allowed.

(f) Interest on claims. In any case in which a taxpayer is entitled to a refund in a carryback year due to the carryback of a farm loss, interest shall be computed only from the end of the taxable year in which the loss occurs.

3. See, for example, McDaniel, *Tax Expenditures in the Second Stage: Federal Tax Subsidies for Farm Operations*, 49 So.Calif.L.Rev. 1277 (1976). Exact knowledge of the purposes or situation which prompted the legislature to adopt a particular classification is unnecessary in deciding constitutionality. *Hassler v. Eng-*

arises because farming operations, since the early days of the income tax, have received more liberal tax treatment. These more liberal rules, granted for federal purposes under the Internal Revenue Code, have been incorporated into Minnesota's income tax law through adoption of the federal adjusted gross income as the starting point for calculating the state tax. Minn.Stat. § 290.01, subd. 20.

Thus, costs of raising breeding livestock, costs of developing farms and orchards, and expenditures for soil and water conservation, fertilizer, and soil conditioners, which ordinarily would be chargeable to a capital account and deferred, may be used by the farmer as a current expense deduction. Moreover, the farmer may elect to use the cash method of accounting and ignore year-end inventories, as well as payables and receivables.[4]

While this liberal treatment for farming may well be desirable on a policy basis, what has happened is "the special tax rules for farmers have been converted into tax shelter arrangements for high bracket investors * * *." McDaniel, *Tax Expenditures in the Second Stage: Federal Tax Subsidies for Farm Operations*, 49 So.Calif. L.Rev. 1277 at 1281 (1976) (quoting Panel Discussion Before the House Comm. on Ways and Means on the Subject of General Tax Reforms, 93d Cong., 1st Sess. pt. 5, at 615 (1973)). While articles on the tax loss farming problem highlight the abuse of upper tax bracket persons, the problem is apparently more one of a continuum, since it appears "losses become more frequent as individual gross income increases." Note, *Farm Tax Advantages after the Tax Reform Act of 1976: Congress Finds the Nee-*

*dle but Misses the Haystack*, 27 Cleveland St.Law Rev. 85, 112 (1978) (quoting from Carlin and Woods, Tax Loss Farming, ERS–546, U.S. Dept. of Agriculture, 8–9 (1974)).

We look now at Mr. and Mrs. Guilliams' situation, the facts of which were stipulated to and adopted by the tax court. In 1970, Mr. and Mrs. Guilliams, then living in the Twin Cities, decided they wanted to farm and purchased a farm near Hinckley, where they have resided since 1971. In 1973, with the birth of her child, Mrs. Guilliams quit her city job. Mr. Guilliams, however, continued to work as a computer programmer for Control Data, commuting 146 miles daily. His reason for doing so was to earn the income necessary to become a full–time, successful farmer.

The Guilliams had to extend their date for full–time farming because of inflation and the price–fall experienced by cattlemen in 1974 through 1976. Because of a bad market, they sold their cattle in October 1974 to minimize potential losses, but bought cattle again in 1977. In the taxable years of 1975 and 1976, respondents had no cattle and derived their farm income solely from the sale of hay raised on the farm. During these 2 years, Mr. Guilliams would cut the hay in the morning before going to his job at Control Data and his wife, with some part–time help, would bale it.

In 1975, Mr. and Mrs. Guilliams grossed $7,479 from their farm but had an operating loss of $14,195, which included real estate taxes of $1,013 and interest of $2,042. In the same year, their gross nonfarm income was $20,546.48, which included $19,-481.47 wages from Control Data.

berg, 233 Minn. 487, 510, 48 N.W.2d 343, 357 (1951). The United States Supreme Court in *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979), puts the burden of proof on the complainant to show that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."

**4.** 26 U.S.C.A. § 175 (1978), I.R.C. § 175 (expenditures for soil and water conservation); 26 U.S.C.A. § 180 (1978), I.R.C. § 180 (expendi-

tures for the enrichment or conditioning of land); 26 U.S.C.A. § 182 (1978), I.R.C. § 182 (cost of clearing land). Farmer may elect accrual or cash accounting. 26 U.S.C.A. § 446 (1978), I.R.C. § 446.

In our case here, Mr. and Mrs. Guilliams did take current deductions for "fertilizers, lime, and chemicals" in both tax years. Normally, such expenditures would be chargeable to capital account and deferred, but because of the special rules in 26 U.S.C.A. § 180 they were allowed as current expense.

In 1976, the gross farm income was $8,556 with a farm operating loss of $13,430, including real estate taxes of $958 and interest of $3,556. In the same year, respondents' nonfarm gross income (adjusted for some rental depreciation) was $20,518.95, including Control Data wages of $20,573.47. As stated above, on both their 1975 and 1976 income tax returns, Mr. and Mrs. Guilliams took their full farm operating loss in calculating their state income tax liability without applying § 290.09, subd. 29. The parties agree that, if the statute is valid, the commissioner applied it correctly in auditing the tax returns.

Mr. and Mrs. Guilliams are "legitimate" farmers. All parties agree. In other words, their farming operation is serious and profit motivated and not a scheme to shelter Mr. Guilliams' income from Control Data; quite the contrary, the nonfarm income was earned in order to stay on the farm, and, as the tax court observes, to preserve the family farm a spouse may well have to supplement farm income with nonfarm earnings. This being so, respondents contend the law's classification, which lumps them with the tax loss farmer, is arbitrary. The tax court agreed, holding the law was a denial of equal protection and uniformity under the federal and state constitutions, respectively, and, further, took their property without due process of law.

■ We first examine the equal protection claim.[5] There is, of course, a presumption in favor of the constitutionality of the statute, and the challengers "have the burden to show beyond a reasonable doubt that the act conflicts with the uniformity clause of the state constitution." *Contos v. Herbst,* 278 N.W.2d 732, 736 (Minn.1979); *Miller Brewing Co. v. State,* 284 N.W.2d 353 (Minn.1979). Indeed, in the field of taxation, the legislature's power is inherently broader and its exercise more flexible than in other areas. *Reed v. Bjornson,* 191 Minn. 254, 263, 253 N.W. 102, 106 (1934).

The statute classifies taxpayers with farm and nonfarm income into (1) those with $15,000 or less of nonfarm income, and (2) those with more than $15,000 of nonfarm income. The tax court felt, as respondents urge, that the relevant inquiry should not be the amount of nonfarm income but whether the taxpayer is a legitimate (or "real") farmer or a "tax loss" farmer.

■ This court has listed three factors to consider in measuring a statutory classification against the equal protection requirement:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Miller Brewing Co. v. State,* 284 N.W.2d at 356.

■ Minn.Stat. § 290.09, subd. 29 (1978), meets these criteria. The purpose of the statute, to take the last factor first, is clearly legitimate, to curb a well-known tax abuse. Further, the classifications are genuine and relevant to the purpose of the law, since it is the farm/nonfarm distinction which is at the root of the problem. And, finally, as to the first factor, the use of nonfarm income to distinguish between two classes of farm income taxpayers is not "manifestly arbitrary or fanciful" but provides "a reasonable basis" for the classification.

---

**5.** Minn.Const. art. 10, § 1, provides: "Taxes shall be uniform upon the same class of subjects and shall be levied and collected for public purposes * * *." This clause is no more restrictive than, and may here be treated the same as, the equal protection clause of the 14th amendment. *See Contos v. Herbst,* 278 N.W.2d 732, 736 n. 2 (1979). The 14th amendment says: "No state shall · * * * deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. amend. XIV.

Since expenses and accounting procedures are treated differently for farm and nonfarm income, it is reasonable for the legislature to treat the two sources of income differently. Whether or not respondents are "real" farmers is not the point; the statute applies to all persons engaged in farming, real or not, with respect to nonfarm income.

In considering the extent to which farm losses, with their special calculation, might be used to offset nonfarm income, the legislature, as part of its statutory solution, had a reasonable basis for using $15,000 as the figure to trigger the offset limitation.[6] As the commissioner points out, taxpayers who are engaged in both farming and nonfarming businesses continue to be able to offset their farm losses in full against farm income. Also, the farmer who does not use all of his farm losses in a particular year because of the statutory limitation may carry back the unused portion 3 years or carry it forward 5 years. Interest and taxes may continue to be deducted in full against both farm and nonfarm income. Moreover, the statute does not affect the full-time farmer nor the farmer who earns less than $15,000 from nonfarm sources. While one can sympathize with respondents here, it is still true that under § 290.09, subd. 29, they were able to take approximately 54% of their claimed 1975 farm losses and 63% of their claimed 1976 farm losses.

■ The fact that the classification includes respondents, who are not seeking to operate a farm at a loss in order to shelter their nonfarm income (although in fact they are sheltering some of that income), does not make the statute constitutionally infirm. If the classification has some reasonable basis, it does not offend the constitution simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78,

31 S.Ct. 337, 340, 55 L.Ed. 369 (1911), quoted in *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

As the Supreme Court stated in *Personal Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979), the 14th amendment guarantees only equal laws, not necessarily equal results, and:

When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. [Citations omitted.] The calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility.

Especially would this seem so here where the farm loss modification law involves a question of taxation and the classification does not burden a suspect class (such as a racial minority) or a fundamental right (such as freedom of speech).

The legislature could have utilized a test as to who was a "real" farmer and who was not, but it was not compelled to do so, and there is reason to believe such a test would be difficult to apply. *See, e. g.*, Allington, *Farming as a Tax Shelter*, 14 So.Dak.L.Rev. 181, 189–200 (1969); Krolls, *Tax Reform Act of 1969 and the Farmer*, 48 Taxes 329, 330 (June 1970). Respondents argue the statute also discriminates against couples on a family farm who file joint returns; but this is an election the taxpayers are free to make or not make and involves no constitutional discrimination. Nor is it fatal that the statute is under-inclusive by failing to include certain investors in limited farm partnerships. A statute is not constitutionally defective because it might have gone further than it actually did. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *Roschen v. Ward*, 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722 (1929).

6. It is interesting to note that the legislature has once adjusted its formula. The original 1973 version of Minn.Stat. § 290.09, subd. 29, defined the cutoff limitation as "not to exceed the amount of $10,000 reduced by the amount by which such nonfarm income exceeds the amount of $10,000." This was amended to its present wording by 1975 Minn.Laws, ch. 437, applicable to taxable years beginning January 1, 1974.

We conclude, therefore, that § 290.09, subd. 29, does not offend either the equal protection clause or the uniformity clause.

 Does the statute violate due process? The tax court held that it does, because it creates a conclusive presumption that those who farm but who also have nonfarm income of $15,000 a year or more are tax loss farmers. This argument, really, is a variation of the equal protection rationale, since it simply repeats the objection as to the manner in which persons under the law are classified. *See* J. Nowak, *Constitutional Law* 497 (1980). A classification that satisfies the equal protection clause will satisfy the due process clause of the fifth amendment. *Weinberger v. Salfi,* 422 U.S. 749, 770, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522 (1975).

Moreover, it also satisfies our state's due process clause, which here need not be construed more strictly than the federal. *Shreve v. Dept. of Economic Security,* 283 N.W.2d 506 (Minn.1979) (upholding an irrebuttable presumption in the unemployment compensation act that a person who is a student is not available for work).

The order of the tax court is reversed.