Milton P. and Mitzi REISER, et
al., Relators,

v.

COMMISSIONER OF
REVENUE, Respondent.

No. C6-85-37.

Supreme Court of Minnesota.

June 14, 1985.

Howard J. Kouffman, Elinor C. Rosen-
stein, Minneapolis, for relators.

Hubert H. Humphrey, III, Atty. Gen.,
Thomas Overton, Asst. Atty. Gen., Dept. of
Revenue, St. Paul, for respondent.

YETKA, Justice.

The taxpayers appeal, by writ of certiora-
ri, the tax court's determination that cer-
tain deductions claimed on the taxpayers'
1978, 1979, and 1980 tax returns should be
disallowed or modified. The taxpayers are
all investors in a tax shelter. Originally,

each taxpayer individually appealed the disallowance of the deductions to the tax court. Several of the appeals were consolidated on February 22, 1983, and the rest by stipulations of March 31, 1983, April 29, 1983, May 17, 1983, August 2, 1983, and August 18, 1983. The case was submitted to the tax court on stipulated facts. On those facts, the tax court determined that the deductions were properly disallowed. This appeal followed. We affirm the tax court.

The 27 taxpayers involved in this case are all investors in S & W Company, a Minnesota partnership organized in 1968 to breed Black Angus cattle as a tax shelter device. S & W was used for tax deferral since federal tax law permitted accelerated depreciation of the price paid for the breeding herd over a 5-year period and permitted full current yearly deductions for all feed, care, interest, and other business expenses while income was not reported until the animals were actually sold.

In 1974, S & W decided to sell its entire existing herd. The selling was done through the organizer and general partner of S & W, Sheldon Wert. Wert had started another cattle-breeding partnership called Brownlee Cattle Company. The S & W herd was sold to Brownlee. The parties agreed that:

1) Brownlee would pay $2,322,500 for the herd;

2) $765,150 of the purchase price would be paid in cash, $720,000 by a note from Brownlee to S & W bearing interest at 7½% per annum payable in one installment of $500,000 plus interest on December 1, 1975, and one installment of $220,000 plus interest on December 1, 1976;

3) The balance of the purchase price, $837,350, was paid by Brownlee assuming S & W's pre-existing indebtedness to Northwestern National Bank of Minneapolis; and

4) Brownlee's liability on the note to S & W and the bank debt was limited to the business assets of Brownlee and no partner of Brownlee assumed any liability on the note or bank debt.

Some of Brownlee's limited partners were very unhappy with the agreement and refused to pay. Brownlee sued those limited partners, but never recovered from them because the dissenting partners brought a separate securities fraud action against Brownlee and S & W.

In the securities fraud action, a trial was held and S & W had to defend itself at what it termed "great expense." A jury found that S & W was a "controlling person" of Brownlee exposing the S & W general partners to liabilities "in excess of $500,000."

To cover expenses, Howard Kahn was appointed as wind-up partner for S & W. He sued all the other S & W partners to require them to return to S & W "all of the distributions, plus interest, which S & W had made both out of the proceeds of the 1973 cattle dispersion sale and its 1974 sale to Brownlee."

Considerable post-trial activity continued in the securities fraud suit, but, eventually, a settlement was reached in 1980. S & W had to forego collecting the balance on the Brownlee notes and pay a settlement fee to Brownlee. The S & W partners sought to deduct the costs of litigating the lawsuits, the balance of the Brownlee note which was uncollectable, the costs of winding up the partnership, and the cost of the settlement paid to the Brownlee limited partners from their state income tax returns for 1978, 1979, and 1980.

The issues raised by taxpayers are:

1) Does Minn.Stat. § 290.09, subd. 29 (1984), the tax statute limiting the amount of nonfarm income a taxpayer can use to offset losses "arising from a farm," apply only to ongoing farming operations?

2) Does Minn.Stat. § 290.09, subd. 29 (1984) apply to:

a) The costs of litigation stemming from an allegedly fraudulent sale of cattle;

b) The balance due on an uncollectable note from the sale of cattle;

c) The costs of settling the litigation of the allegedly fraudulent sale of cattle?

Tax law has traditionally treated the taxation of farms in a very liberal fashion. For example, the costs of the farm, "which ordinarily would be chargeable to a capital account and deferred, may be used by the farmer as a current expense deduction." *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138, 141 (Minn.1980). As well, farmers may elect the cash method of accounting and "ignore year-end inventories, as well as payables and receivables." *Id.* By buying into farms, investors in high tax brackets have been able to shield their ordinary nonfarm income by offsetting it against the losses provided by the liberal farm tax rules. McDaniel, *Tax Expenditures in the Second Stage: Federal Tax Subsidies for Farm Operations*, 49 So.Cal. L.Rev. 1277, 1281 (1976).

The Minnesota Legislature sought to eliminate the farm loss tax shelter by limiting the amount of nonfarm income which can be offset against farm losses. Act of May 24, 1973, ch. 737, § 2, 1973 Minn.Laws 2212, 2216–17, as amended by Act of June 6, 1975, ch. 437, art. V, § 1, 1975 Minn. Laws 1573, 1606 (now codified at Minn. Stat. § 290.09, subd. 29 (1984)). Farm income and losses, except for interest and taxes, are netted. If there is a net loss, the net loss may be freely offset against nonfarm income if the nonfarm income is $15,-000 or less. If the nonfarm income is more than $15,000, a reduction formula is applied which effectively disallows any offset if the nonfarm income is greater than $22,500. Unused farm loss may be carried back 3 years or carried forward 5 years. *Id.*[1] *See Guilliams*, 299 N.W.2d at 140.

1. *Whether Section 290.09 Applies Only to Ongoing Farming Operations*

■ The taxpayers contend that the statute only applies to ongoing farm operations and that they ceased their farming operations as of 1974, making the statute inapplicable to them in 1978–80. Their legal argument stands, however, on tenuous pastureland. The argument that Minn.Stat. § 290.09 applies only to ongoing farming operations stems not from the statute, for it makes no such mention, but from the Minnesota Department of Revenue's release of February 1983. The part of the release which so exercises the taxpayers is as follows:

The limitation requires that all income, gains, losses, and expenses (except for interest and taxes) be combined to determine if a net loss from farming exists. The farm income or loss can be from farm schedule of income or loss, supplemental income schedule if farm income is from a partnership, Subchapter S corporation, or rental on a share crop basis where the taxpayer has some managerial control over the utilization of the land. It could also include gains from farming reflected on the capital gain or loss schedule or the supplemental schedule of gains or losses. For this purpose, the full gain is used before applying the net capital gain deduction. Investment credits and the recapture of investment credits would also be considered to the extent such credits or their recapture were on assets utilized in the production of farm income.

For this purpose farm income is any income derived from an ongoing operation which arises in connection with raising or harvesting of any agricultural or horticultural community. It includes the raising, shearing, feeding, training, caring for, and management of livestock. * * * The Department does consider [that] the sale of farm assets in the ongoing business of farming would be considered farm income. That is, the sale of a tractor which has a recognized gain would be considered farm income as long as it is not part of the sale of all farm assets connected with the discontinuance of the farm operation.

Minn.Tax Reports (CCH) ¶ 201–256.

Assuming, for argument's sake, that the taxpayers' interpretation of the release is

---

1. Since this case arose, the statute has been amended to allow offsets against greater nonfarm incomes. Act of June 14, 1983, ch. 342, art. I, § 22, 1983 Minn.Laws 2168, 2195.

correct, the release is not itself law. It only seeks to explain the law as found in Minn.Stat. § 290.09, subd. 29. If the release has any effect in the law, it would only be as a means of estopping the Department of Revenue from interpreting the statute differently.

A long line of Minnesota cases has held that estoppel has no application to state sovereign powers such as taxation. *See, e.g., Spratt v. Hatfield,* 267 Minn. 535, 539, 127 N.W.2d 545, 548 (1964); *County of Olmsted v. Barber,* 31 Minn. 256, 17 N.W. 473 (1883). Those cases have, however, been overruled. The new rule is that "if justice demands, estoppel can be applied against the government even when it acted in a sovereign capacity if the equities advanced by the individual are sufficiently great." *Mesaba Aviation v. County of Itasca,* 258 N.W.2d 877, 880 (Minn.1977). In spite of the more liberal standard, however, this court noted that "[w]e do not envision that estoppel will be freely applied against the government." *Id.*

In this case, the Department of Revenue issued the release in February 1983. The taxes in dispute were for the years 1978, 1979, and 1980. The taxpayers could not have relied, to their detriment, on the release since it was not published when they filed. The taxpayers have shown no compelling reason why the government should be estopped. Thus, the focus of our discussion becomes whether the losses the taxpayers seek to offset against nonfarm income "arise from a farm" under the statute.

2. *Whether "Arising From a Farm" Includes:*

"Arising from a farm" is defined in the statute as

income and gains and expenses and losses * * * received or incurred in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, including horses, bees, poultry, and fur-bearing animals and wildlife, and

all operations incident thereto, including but not limited to the common use of "hedging."

Minn.Stat. § 290.09, subd. 29 (1984). The statute applies to all "income and gains and expenses and losses," and then lists a number of included activities. Those activities are not given to narrow the statute's reach, but to exemplify its breadth. To eliminate the tax shelter effectively, the statute's coverage would have to be expansive; thus, the statute should be read broadly rather than narrowly as the taxpayers argue.

a. *Litigation Costs*

 The taxpayers lump professional fees (mainly attorney fees) and management fees (those paid to the wind-up partner) into one category of litigation-related expenses. The litigation, in the form of a securities fraud action, arose because S & W sold its herd of cattle for a price that several investors in the partnership that bought the herd thought unreasonable.

The taxpayers attach much importance to the label "securities fraud" when they claim that "[n]o connection whatsoever exists between these activities and the activities listed in the statute." The litigation, they write, is not an "expense incident to raising cattle." That may be true; putting trial briefs in the feed trough will not fatten their steer. The issue is, however, much broader: Was the litigation a cost "arising from a farm?" The litigation was a direct result of the sale of cattle. Sale of cattle is not listed in the statute, but the list of activities is non-exclusive. Sale of livestock or crops is a normal activity of a farm. Indeed, it could well be the quintessential activity of a farm and, thus, arises from a farm. The lawsuit was the direct result of S & W's activities in the sale of the cattle; thus, it also "arises from a farm." The state's application of the statute to these litigation expenses is not, as the taxpayers claim, a tortured interpretation of the statute. Rather, the tortured interpretation is the taxpayers' interpretation, their attempt to deny that this lawsuit

"arises from a farm" when it arose because their partnership attempted to overcharge the buyers of their cattle.

### b. *Bad Debts*

■ S & W had not collected all of the agreed purchase price for the cattle when the deal began to run into trouble. The unpaid portion was secured by notes to be paid by Brownlee. The S & W investors decided to forego collecting on those Brownlee notes as part of the settlement of the lawsuit over the cattle.

The taxpayers argue that the bad debt is not one of the "special tax rules for farmers" used for sheltering income and, thus, should not be subject to section 290.09, subdivision 29. Again, however, the taxpayers misstate the issue. The issue is whether this bad debt is a loss "arising from a farm." Again, the loss is directly the result of the sale of the cattle. It is, therefore, a loss "arising from a farm" and subject to the statute.

As the tax court noted:

Appellant argues that because bad debts are not losses deductible under Minn.Stat. § 290.09, subd. 5 and because bad debts are not "business expenses" deductible under Minn.Stat. § 290.09, subd. 2, these losses should not be limited by the Farm Loss Modification Statute.

Nowhere is the farm loss modification restricted to items deductible under § 290.09, subds. 2 and 5. It applies to all "expenses and losses, except for interest and taxes." Interest (deductible under Minn.Stat. § 290.09, subd. 3) and taxes (deductible under § 290.09, subd. 4) are included within the broad category of "expenses and losses" even though they are not deductible under § 290.09, subds. 2 or 5. Otherwise, interest and taxes would not have had to be specifically excepted from the statute. Clearly, the legislature did not intend to restrict the effect of the farm loss modification only to items deductible under § 290.09, subds. 2 and 5. The terms "expenses and losses" include other items deductible under § 290.09, such as bad debt losses.

### c. *Costs of Settlement*

■ To settle the litigation, S & W paid Brownlee $289,210. Again, because the litigation concerned the sale of the cattle, the settlement should be considered "arising from a farm" under the broad language of section 290.09, subdivision 29. Cattle were sold, but the sale did not end with the signing of the papers and the transfer of the cattle. Because the price was set exorbitantly high, the lawsuit obtained. Just because it was titled "securities fraud" does not change the fact that the underlying dispute was about the price of cattle. Thus, all costs of the litigation, including the settlement itself, are part of the sale of the cattle. Therefore, the settlement costs "arise from a farm" under Minn.Stat. § 290.09, subd. 29 (1984).

In summation, as the tax court eloquently and persuasively wrote in its decision:

Using farm losses to shelter non-farm income is precisely what the farm loss modification was intended to prevent. *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138 ([Minn.] 1980). The Commissioner correctly applied the statute to disallow appellants' deduction of farm losses beyond the $15,000 allowed by statute.

Accordingly, the tax court is affirmed.