670 So.2d 892 (1995)
Ex parte Darryl Pierre WOODEN.
(Re Darryl Pierre Wooden v. State).
1941836.
Supreme Court of Alabama.
November 22, 1995.
*893 Tommy Nail, Birmingham, for petitioner.
Jeff Sessions, Atty. Gen., for respondent.
MADDOX, Justice.
WRIT DENIED.
HOOPER, C.J., and SHORES, HOUSTON, KENNEDY, INGRAM, and BUTTS, JJ., concur.
COOK, J., concurs specially.
COOK, Justice (concurring specially).
Darryl Pierre Wooden, a black male, seeks certiorari review of a judgment of the Court of Criminal Appeals affirming his sentence to a term of 10 years' imprisonment, which sentence included 5 years under the mandatory sentencing provision of Ala.Code 1975, § 13A-12-250, and 5 years under the mandatory sentencing provision of Ala.Code 1975, § 13A-12-270. Those sections provide:
"[§ 13A-12-250] In addition to any penalties heretofore or hereafter provided by law for any person convicted of an unlawful sale of a controlled substance, there is hereby imposed a penalty of five years incarceration in a state corrections facility with no provision for probation if the situs of such unlawful sale was on the campus or within a three-mile radius of the campus boundaries of any public or private school, college, university or other educational institution in this state."
"[§ 13A-12-270] In addition to any penalties heretofore or hereafter provided by law for any person convicted of an unlawful sale of a controlled substance, there is hereby imposed a penalty of five years incarceration in a state corrections facility with no provision for probation if the situs of such unlawful sale was within a three-mile radius of a public housing project owned by a housing authority."
(Emphasis added.)
Wooden's conviction and 10-year mandatory sentence resulted from his sale to an undercover police officer of one tablet of "hydromorphone."[1] Indisputably, this $50.00 transaction, which occurred on the "100 Block of Fourth Avenue North [in] Birmingham," occurred within a three-mile radius both of a school and of a housing project. At his trial, Wooden challenged the constitutionality of these statutes on the ground that they "overwhelmingly and disproportionately impose[] a heavier sentence upon black defendants in Jefferson County, [than on] similar defendants in other Alabama Counties." Petition and Brief in Support of a Writ of Certiorari to the Court of Criminal Appeals, at 13. This result followed, because, he argued, "the overwhelming majority of citizens living in the City of Birmingham are black." Petition, at 4. Consequently, he contended, these statutes violate the equal protection and due process guarantees afforded the black citizens of Birmingham.
Evidence on this issue included the testimony of Birmingham police officers B.H. Butler and Eric Benson and Alabama Administrative Office of Courts official Larry Forston. Butler testified that of 150 arrests he had made for the "unlawful sale of a controlled substance," 145 of the persons arrested were black and were subject to the enhanced sentence provisions of §§ 13A-12-250 and -270. Benson testified that of approximately 100 arrests he had made for the "unlawful sale of a controlled substance" in the preceding year, 70% of those arrested were black. He also "testified that any sale of a controlled substance within the city limits of Birmingham would be within three miles of both a school and a housing project, and that 98% to 99% of those ... living in these housing projects [are] black." Petition and Brief in Support of a Writ of Certiorari to the Court of Criminal Appeals, at 5.
Forston, however, presented computer data gleaned from circuit court clerks' offices throughout the state. He testified that from 1989, when the three-mile-radius provisions were adopted,[2] through 1994, only three black *894 defendants and one white defendant were sentenced in Jefferson County under either statute, compared with 267 black defendants and 90 white defendants sentenced elsewhere in the state.
The trial court rejected Wooden's challenge and imposed the sentence required by each statute. The Court of Criminal Appeals, by an unpublished memorandum, affirmed the conviction and the sentence. In his petition for certiorari review, Wooden seeks a judgment setting aside his sentence and invalidating the two statutes as repugnant to the equal protection and due process guarantees provided by the United States Constitution and the Alabama constitution. I concur in the denial of the petition, because this petitioner has failed to present facts and statistics sufficient to demonstrate an equal protection or due process deprivation under either the United States Constitution or the state constitution. I write specially, however, to acknowledge the gravity of the federal and state constitutional issues implicated by these statutes.
My concern focuses on statistics generated in two reports promulgated by the "Sentencing Project" regarding the impact on black Americans of the recent spate of federal and state "anti-drug" legislation of various species. The first such report was M. Mauer, Young Black Men and the Criminal Justice System: A Growing National Problem (The Sentencing Project, February 1990). This report was followed by M. Mauer & T. Huling, Young Black Americans and the Criminal Justice System: Five Years Later (The Sentencing Project, October 1995) (hereinafter Young Black Americans).
These studies revealed that as of 1990, 23% of black males "in the age group 20-29 [were] under some form of criminal justice supervisionin prison or jail, on probation or parole." Young Black Americans, at 1. As disturbing as these figures are, the latest statistics reveal that the number of black males in the same age group under "criminal justice control" has, in the last five years, risen to 32.2%. Id. at 3. Adding to this problem is the fact that the number of black females under criminal justice control is currently increasing even more dramatically. That number increased between 1989 and 1994 by 78%. Id. at 5. This increase contrasts with statistics demonstrating that the arrest rate of black Americans for violent crimes has remained relatively constant. Id. at 1.
That these increases are based primarily on federal and state prosecutions of drug-related offenses was clearly expressed in the following statement of the Sentencing Project's findings:
"Drug policies constitute the single most significant factor contributing to the rise in criminal justice populations in recent years, with the number of incarcerated drug offenders having risen by 510% from 1983 to 1993. The number of Black ... women incarcerated in state prisons for drug offenses increased more than eight-fold828%from 1986 to 1991."
Id. at 1. (Emphasis added.)
But perhaps the most troubling statistics presented by the Sentencing Project were those showing the relationship between drug use among black Americans and the frequency of drug-related arrests, prosecution, and sentencing of blacks. Citing a recent survey conducted by the National Institute on Drug Abuse, for example, the Sentencing Project reported that black Americans constitute "13% of monthly drug users." Id. at 9. This figure, interestingly enough, corresponds closely to figures derived from the latest national census showing that blacks comprise approximately 12.3% of America's total population. A. Walinsky, The Crisis of Public Order, Atlantic Monthly, July 1995, at 48. Black Americans, however, account for 39% of arrests for drug-related offenses. Young Black Americans, supra, at 1.
In certain contexts, at least, evidence of such a disparate impact on an ethnic group permits a strong inference of invidious discrimination. See Ex parte Bird, 594 So.2d 676, 680 (Ala.1991) ("disparate treatment [of prospective jurors] furnishes ... evidence of" racial discrimination in jury selection).
*895 In the context of drug enforcement, however, the courts of the United States do not, as yet, hold that disparity in criminal justice control based on drug-related offenses constitutes evidence of discrimination sufficient to invoke a heightened degree of scrutiny under federal equal protection guarantees. See McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); see also United States v. Lattimore, 974 F.2d 971 (8th Cir. 1992), cert. denied, 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). More specifically, the federal courts do not apply a searching analysis of a statute that is facially neutralthough racially discriminatory in its effectin the absence of evidence that the legislature enacted the statute "`"because of," not merely "in spite of," its adverse effects upon an identifiable group.'" McCleskey, 481 U.S. at 298, 107 S.Ct. at 1770 (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979)). In the absence of such evidence, the statute will be upheld if it has "a legitimate purpose," and if the court deems it "reasonable for lawmakers to believe that the use of the challenged [course of action] would promote that purpose." United States v. King, 972 F.2d 1259, 1260 (11th Cir.1992). As currently applied, this standard virtually assures that such a statute will survive a constitutional challenge.
Recently, however, at least one state supreme court has considered evidence of disparate impact sufficient to invalidateon the ground of equal protection afforded by its state constitutiona statute penalizing the possession of a quantity of "cocaine base" ("crack cocaine") more severely than the possession of a greater quantity of cocaine powder. State v. Russell, 477 N.W.2d 886, 887 (Minn.1991). The defendants in Russell, five black Americans charged with possession of crack cocaine, produced evidence demonstrating that in 1988, 96.6% of defendants charged with possession of crack were black, while 79.6% of defendants charged with possession of powder cocaine were white. Id. at 887 n. 1. They further demonstratedand the trial court foundthat "a far greater percentage of blacks than whites [had been] sentenced for possession" of crack cocaine under the statute. Id. at 887. Thus, because of the greater penalties imposed for possession of crack, black cocaine offenders received considerably longer sentences than did their "white counterparts." Id. On the basis of this evidence, the trial court dismissed the charges, holding that the challenged statute "violated constitutional guarantees of equal protection." Id.
Affirming the judgment of the trial court, the Minnesota Supreme Court refused to analyze the statute on the basis of the Fourteenth Amendment, and, therefore, refused to apply the "federal rational basis test." Id. at 887-88. Instead, holding that the statute violated the equal protection guarantee afforded by Minn. Const. art. 1, § 2,[3]id. at 891, *896 the court "[struck] the statute as unconstitutional under the rational basis test as articulated under Minnesota law." Id. at 888 (emphasis added).
Clear at the outset of the court's discussion was the fact that, despite the semantical similarity of the Minnesota standard of review to the federal rationality test, the state standard provided a more meaningful review. In this connection, the court stated:
"[I]n cases where we have applied what may be characterized as the Minnesota rational basis analysis, we have been unwilling to hypothesize a rational basis to justify a classification, as the more deferential federal standard requires. Instead, we have required a reasonable connection between the actual, and not just the theoretical, effect of the challenged classification and the statutory goals."
Id. at 889 (emphasis added). Thus, under the Minnesota test:
"`(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statue must be one that the state can legitimately attempt to achieve.'"
Id. at 888 (quoting Wegan v. Village of Lexington, 309 N.W.2d 273, 280 (Minn.1981), and Guilliams v. Commissioner of Revenue, 299 N.W.2d 138, 142 (Minn.1980)).
The court concluded that the statute failed both the first and second prongs of the court's three-part test. As to the first prong, for example, it characterized as "anecdotal" testimony presented by the Hennepin County Attorney's Office at legislative hearings, which testimony purported to demonstrate that the possession of three grams of crack "indicated a level at which dealing, not merely using, took place," and, therefore, that the challenged classification was justified as tending "to facilitate prosecution of `street level' drug dealers." Id. at 889. The official's testimony was, concededly, not based on scientific data or research, and, moreover, was the "primary testimony before the legislature on the distinction between crack ... and powder cocaine." Id. Citing findings supplied by the defendants based on a Minnesota Department of Public Safety Office of Drug Policy report contradicting the official's testimony, the court found insufficient "factual support" for the challenged classification, and, consequently, concluded that the statutory distinction between the two forms of cocaine was "based upon an arbitrary rather than a genuine and substantial distinction." Id. at 890 (emphasis added).
The Minnesota "rational basis test" closely resembles the test Alabama has applied in challenges based on the equal protection guarantee afforded by Ala. Const. 1901. See Smith v. Schulte, 671 So.2d 1334 (Ala.1995) (striking down, as violating the equal protection guarantee of the Alabama constitution, Ala.Code 1975, § 6-5-547, which limited to $1,000,000 the amount recoverable in a wrongful death action against medical providers) (four Justices concurring in the rationale); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991) (plurality concluding that Ala.Code 1975, 6-5-544(b), which limited to $400,000 the amount recoverable for noneconomic loss in actions against medical providers, violated state equal protection guarantee). Under this test "`there must be some reasonable relation to the regulation and to the ends to be attained.'" Moore, 592 So.2d at 166 (plurality opinion).
In Moore, the plurality reviewed data published by the United States General Accounting Office regarding the effect of damages limitations on the availability of health care the legislature's stated objectiveand found the connection of that objective to the means selected to achieve it to be "so attenuated and remote as to constitute an unreasonable exercise of police power." Id. at 167. Thus, *897 the standard used in Moore, like the one used in Russell, involved a more meaningful review of the challenged legislation than would have obtained under the federal "rational basis" test. Smith v. Schulte, 671 So.2d at 1349 ("Moore plurality applied a more rigorous standard of review than the Fourteenth Amendment would, arguably, have required"). Moreover, the standard applied in Moore and Smith involves a "balancing test" that sharpens or blunts the scrutiny of legislation, depending on the importance of the rights affected. Smith, 671 So.2d at 1338 ("factor to be weighed ... is the relative importance of the private right or interest burdened by the statute").
In my view, a properly presented challenge of the three-mile radius and mandatory-sentence provisions of §§ 13A-12-250 and 13A-12-270, should invoke a standard of review under the Alabama constitution at least as searching as the one employed in Moore and Smith. This is true because, as Russell observed, "[t]here comes a time when we cannot and must not close our eyes when presented with evidence that certain laws, regardless of the purpose for which they were enacted, discriminate unfairly on the basis of race." Russell, 477 N.W.2d at 888 n. 2 (emphasis added).
Properly presented, such a challenge should focus on the disparity, if any, between rates of conviction and sentences imposed locally and statewideupon the black citizens of Alabama vis-à-vis white citizens. In such a case, specific data demonstrating that a disproportionate number of the Alabama citizens who reside in urban areas and, therefore, naturally within three miles of schools or housing projects, are black, would be crucial. Such a challenge should, as a matter of course, also present to the trial judge statistics, like those published by the Sentencing Project in the studies discussed above, that would reveal the disparity in criminal justice control based on drug-related offenses.
No such statistics are presented in this case. Moreover, the data presented to the trial judgeand to this Courtshowing that throughout the effective periods of these two statutes only three black defendants and one white defendant had been sentenced in Jefferson County under either statute, do not show a disparity sufficient to invoke equal protection scrutiny, especially in view of the petitioner's allegation that "the overwhelming majority of citizens living in the City of Birmingham are black." Indeed, the reliability of these statistics may reasonably be questioned. Consequently, I concur in the denial of the petition for certiorari review in this case.
NOTES
[1] Hydromorphone is a morphine derivative and is designated as a "controlled substance." See Felder v. State, 420 So.2d 851 (Ala.Crim.App. 1982).
[2] See Act No. 89-950, 1989 Ala.Acts 1872 (amending § 13A-12-250 by increasing the applicable radius from one mile to three miles); Act No. 89-951, 1989 Ala.Acts 1873, codified at 13A-12-270.
[3] In a special concurrence, Justice Simonett discussed the source of equal protection under the constitution of Minnesota:

"Equal protection is confirmed in our state constitution as an `unenumerated' constitutional right. Minn. Const. art. 1, § 16 (`The enumeration of rights in this constitution shall not deny or impair others retained by and inherent in the people.'). Article 1, § 2 provides: `No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers.' One of the inherent rights secured to a free people by section 2 is the inherent right to `equal and impartial laws which govern the whole community and each member thereof.' Thiede v. Town of Scandia Valley, 217 Minn. 218, 225, 14 N.W.2d 400, 405 (1944). Put another way, persons similarly situated are to be treated alike unless a sufficient basis exists for distinguishing among them."
Russell, 477 N.W.2d at 893 (Simonett, J., concurring specially) (emphasis added) (footnote omitted).
"Most state constitutions do not contain an `equal protection clause.'" R. Williams, Equality Guarantees in State Constitutional Law, 63 Tex.L.Rev. 1195, 1196 (1985) (emphasis added). Evidently, the Constitution of Minnesotalike that of Alabama, McLendon v. State, 179 Ala. 54, 57-58, 60 So. 392, 393 (1912), is no exception to this rule. Like the Constitution of Minnesota and other state constitutionsAlabama's constitution furnishes that guarantee through several "equality provisions." R. Williams, supra, at 1224. See Roe v. Mobile County Appointment Bd., [Ms. 1940461, March 14, 1995] ___ So.2d ___, ___ (Ala.1995) ("The due process clause of the Alabama constitution and cumulative clauses, read together, guarantee[] equal protection of the laws"); Mayo v. Rouselle Corp., 375 So.2d 449, 452 (Ala.1979) (Sections 1, 6, and 22 of the Alabama constitution guarantee equal protection).